*307 Justice Scalia
delivered the opinion of the Court.
The Massachusetts courts in this case admitted into evidence affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine. The question presented is whether those affidavits are “testimonial,” rendering the affiants “witnesses” subject to the defendant’s right of confrontation under the Sixth Amendment.
I
In 2001, Boston police officers received a tip that a Kmart employee, Thomas Wright, was engaging in suspicious activ *308 ity. The informant reported that Wright repeatedly received phone calls at work, after each of which he would be picked up in front of the store by a blue sedan, and would return to the store a short time later. The police set up surveillance in the Kmart parking lot and witnessed this precise sequence of events. When Wright got out of the car upon his return, one of the officers detained and searched him, finding four clear white plastic bags containing a substance resembling cocaine. The officer then signaled other officers on the scene to arrest the two men in the car — one of whom was petitioner Luis Melendez-Diaz. The officers placed all three men in a police cruiser.
During the short drive to the police station, the officers observed their passengers fidgeting and making furtive movements in the back of the car. After depositing the men at the station, they searched the police cruiser and found a plastic bag containing 19 smaller plastic bags hidden in the partition between the front and back seats. They submitted the seized evidence to a state laboratory required by law to conduct chemical analysis upon police request. Mass. Gen. Laws, ch. 111, §12 (West 2006).
Melendez-Diaz was charged with distributing cocaine and with trafficking in cocaine in an amount between 14 and 28 grams. Ch. 94C, §§32A, 32E(b)(1). At trial, the prosecution placed into evidence the bags seized from Wright and from the police cruiser. It also submitted three “certificates of analysis” showing the results of the forensic analysis performed on the seized substances. The certificates reported the weight of the seized bags and stated that the bags “[h]a[ve] been examined with the following results: The substance was found to contain: Cocaine.” App. to Pet. for Cert. 24a, 26a, 28a. The certificates were sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health, as required under Massachusetts law. Mass. Gen. Laws, ch. 111, § 13.
*309 Petitioner objected to the admission of the certificates, asserting that our Confrontation Clause decision in Crawford v. Washington, 541 U. S. 36 (2004), required the analysts to testify in person. The objection was overruled, and the certificates were admitted pursuant to state law as “prima facie evidence of the composition, quality, and the net weight of the narcotic . . . analyzed.” Mass. Gen. Laws, ch. 111, § 13.
The jury found Melendez-Diaz guilty. He appealed, contending, among other, things, that admission of the certificates violated his Sixth Amendment right to be confronted with the witnesses against him. The Appeals Court of Massachusetts rejected the claim, affirmance order, 69 Mass. App. 1114, 870 N. E. 2d 676, 2007 WL 2189152, *4, n. 3 (July 31, 2007), relying on the Massachusetts Supreme Judicial Court’s decision in Commonwealth v. Verde, 444 Mass. 279, 283-285, 827 N. E. 2d 701, 705-706 (2005), which held that the authors of certificates of forensic analysis are not subject to confrontation under the Sixth Amendment. The Supreme Judicial Court denied review. 449 Mass. 1113, 874 N. E. 2d 407 (2007). We granted certiorari. 552 U. S. 1256 (2008).
II
The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, Pointer v. Texas, 380 U. S. 400, 403 (1965), provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” In Crawford, after reviewing the Clause’s historical underpinnings, we held that it guarantees a defendant’s right to confront those “who ‘bear testimony’ ” against him. 541 U. S., at 51. A witness’s testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. Id., at 54.
Our opinion described the class of testimonial statements covered by the Confrontation Clause as follows:
*310 “Various formulations of this core class of testimonial statements exist: ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.” Id., at 51-52 (internal quotation marks and citations omitted).
There is little doubt that the documents at issue in this case fall within the “core class of testimonial statements” thus described. Our description of that category mentions affidavits twice. See also White v. Illinois, 502 U. S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in judgment) (“[T]he Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions”). The documents at issue here, while denominated by Massachusetts law “certificates,” are quite plainly affidavits: “declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths.” Black’s Law Dictionary 62 (8th ed. 2004). They are incontrovertibly a “ ‘solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” Crawford, supra, at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). The fact in question is that the substance found in the possession of Melendez-Diaz and his codefendants was, as the prosecution claimed, cocaine — the precise testimony the analysts would be expected to provide if called at trial. The “certificates” are functionally identical *311 to live, in-court testimony, doing “precisely what a witness does on direct examination.” Davis v. Washington, 547 U. S. 813, 830 (2006) (emphasis deleted).
Here, moreover,, not only were the affidavits “ ‘made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,’” Crawford, supra, at 52, but under Massachusetts law the sole purpose of the affidavits was to provide “prima facie evidence of the composition, quality, and the net weight” of the analyzed substance, Mass., Gen. Laws, ch. 111, §13. We can safely assume that the analysts were aware of the affidavits’ evidentiary purpose, since that purpose — as stated in the relevant state-law provision — was reprinted on the affidavits themselves. See App. to Pet. for Cert. 25a, 27a, 29a.
In short, under our decision in Crawford the analysts’ affidavits were testimonial statements, and the analysts were “witnesses” for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to “‘be confronted with’ ” the analysts at trial. Crawford, supra, at 54.[1]
*312 III
Respondent and the dissent advance a potpourri of analytic arguments in an effort to avoid this rather straightforward application of our holding in Crawford. Before addressing them, however, we must assure the reader of the falsity of the dissent’s opening alarum that we are “sweeping] away an accepted rule governing the admission of scientific evidence” that has been “established for at least 90 years” and “extends across at least 35 States and six Federal Courts of Appeals.” Post, at 330.
The vast majority of the state-court cases the dissent cites in support of this claim come not from the last 90 years, but from the last 30, and not surprisingly nearly all of them rely on our decision in Ohio v. Roberts, 448 U. S. 56 (1980), or its since-rejected theory that unconfronted testimony was admissible as long as it bore indicia of reliability, id., at 66. See post, at 357-358.[2] As for the six Federal Courts of Appeals cases cited by the dissent, five of them postdated and expressly relied on Roberts. See post, at 349-350. The sixth predated Roberts but relied entirely on the same erroneous theory. See Kay v. United States, 255 F. 2d 476, 480-481 (CA4 1958) (rejecting Confrontation Clause challenge “where there is reasonable necessity for [the evidence] and where . . . the evidence has those qualities of reliability and trustworthiness”).
A review of cases that predate the Roberts era yields a mixed picture. As the dissent notes, three State Supreme Court decisions from the early 20th century denied confrontation with respect to certificates of analysis regarding a *313 substance’s alcohol content. See post, at 349 (citing cases from Massachusetts, Connecticut, and Virginia). But other state courts in the same era reached the opposite conclusion. See Torres v. State, 113 Tex. Crim. 1, 2-4, 18 S. W. 2d 179, 180 (1929); Volrich v. State, 4 Ohio L. Abs. 253 (App. 1925) (per curiam). At least this much is entirely clear: In faithfully applying Crawford to the facts of this case, we are not overruling 90 years of settled jurisprudence. It is the dissent that seeks to overturn precedent by resurrecting Roberts a mere five years after it was rejected in Crawford.
We turn now to the various legal arguments raised by respondent and the dissent.
A
Respondent first argues that the analysts are not subject to confrontation because they are not “accusatory” witnesses, in that they do not directly accuse petitioner of wrongdoing; rather, their testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband. See Brief for Respondent 10. This finds no support in the text of the Sixth Amendment or in our case law.
The Sixth Amendment guarantees a defendant the right “to be confronted with the witnesses against him.” (Emphasis added.) To the extent the analysts were witnesses (a question resolved above), they certainly provided testimony against petitioner, proving one fact necessary for his conviction — that the substance he possessed was cocaine. The contrast between the text of the Confrontation Clause and the text of the adjacent Compulsory Process Clause confirms this analysis. While the Confrontation Clause guarantees a defendant the right to be confronted with the witnesses “against him,” the Compulsory Process Clause guarantees a defendant the right to call witnesses “in his favor.” U. S. Const., Arndt. 6. The text of the Amendment contemplates two classes of witnesses — those against the defendant and those in his favor. The prosecution must produce the for *314 mer;[3] the defendant may call the latter. Contrary to respondent’s assertion, there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation.
It is often, indeed perhaps usually, the ease that an adverse witness’s testimony, taken alone, will not suffice to convict. Yet respondent fails to cite a single case in which such testimony was admitted absent a defendant’s opportunity to cross-examine.[4] Unsurprisingly, since such a holding would be contrary to longstanding case law. In Kirby v. United States, 174 U. S. 47 (1899), the Court considered Kirby’s conviction for receiving stolen property, the evidence for which consisted, in part, of the records of conviction of three individuals who were found guilty of stealing the relevant property. Id., at 53. Though this evidence proved only that the property was stolen, and not that Kirby received it, the Court nevertheless ruled that admission of the records violated Kirby’s rights under the Confrontation Clause. Id., at 55. See also King v. Turner, 1 Mood. 347, 168 Eng. Rep. 1298 (1832) (confession by one defendant to having stolen certain goods could not be used as evidence against another defendant accused of receiving the stolen property).
*315 B
Respondent and the dissent argue that the analysts should not be subject to confrontation because they are not “conventional” (or “typical” or “ordinary”) witnesses of the sort whose ex parte testimony was most notoriously used at the trial of Sir Walter Raleigh. Post, at 343-345; Brief for Respondent 28. It is true, as the Court recognized in Crawford, that ex parte examinations of the sort used at Raleigh’s trial have “long been thought a paradigmatic confrontation violation.” 541 U. S., at 52. But the paradigmatic case identifies the core of the right to confrontation, not its limits. The right to confrontation was not invented in response to the use of the ex parte examinations in Raleigh’s Case, 2 How. St. Tr. 1 (1603). That use provoked such an outcry precisely because it flouted the deeply rooted common-law tradition “of live testimony in court subject to adversarial testing.” Crawford, supra, at 43 (citing 3 W. Blackstone, Commentaries on the Laws of England 373-374 (1768)). See also Crawford, supra, at 43-47.
In any case, the purported distinctions respondent and the dissent identify between this case and Sir Walter Raleigh’s “conventional” accusers do not survive scrutiny. The dissent first contends that a “conventional witness recalls events observed in the past, while an analyst’s report contains near-contemporaneous observations of the test.” Post, at 345. It is doubtful that the analyst’s reports, in this case could be characterized as reporting “near-contemporaneous observations”; the affidavits were completed almost a week after the tests were performed. See App. to Pet. for Cert. 24a-29a (the tests were performed on November 28, 2001, and the affidavits sworn on December 4, 2001). But regardless, the dissent misunderstands the role that “near-contemporaneity” has played in our case law. The dissent notes that that factor was given “substantial weight” in Davis, post, at 345, but in fact that decision disproves the dissent’s position. There the Court considered *316 the admissibility of statements made to police officers responding to a report of a domestic disturbance. By the time officers arrived the assault had ended, but the victim’s statements — written and oral — were sufficiently close in time to the alleged assault that the trial court admitted her affidavit as a “present sense impression.” 547 U. S., at 820 (internal quotation marks omitted). Though the witness’s statements in Davis were “near-contemporaneous” to the events she reported, we nevertheless held that they could not.be admitted absent an opportunity to confront the witness. Id., at 830.
A second reason the dissent contends that the analysts are not “conventional witnesses” (and thus not subject to confrontation) is that they “observe[d] neither the crime nor any human action related to it.” Post, at 345. The dissent provides no authority for this particular limitation of the type of witnesses subject to confrontation. Nor is it conceivable that all witnesses who fit this description would be outside the scope of the Confrontation Clause. For example, is a police officer’s investigative report describing the crime scene admissible absent an opportunity to examine the officer? The dissent’s novel exception from coverage of the Confrontation Clause would exempt all expert witnesses — a hardly “unconventional” class of witnesses.
A third respect in which the dissent asserts that the analysts are not “conventional” witnesses and thus not subject to confrontation is that their statements were not provided in response to interrogation. Post, at 345-346. See also Brief for Respondent 29. As we have explained, “[t]he Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.” Davis, supra, at 822-823, n. 1. Respondent and the dissent cite no authority, and we are aware of none, holding that a person who volunteers his testimony is any less a “ 'witness against’ the defendant,” Brief for Respondent 26, than one who is responding to interrogation. In any event, the ana *317 lysts’ affidavits in this case were presented in response to a police request. See Mass. Gen. Laws, ch. 111, §§ 12-13. If an affidavit submitted in response to a police officer’s request to “write down what happened” suffices to trigger the Sixth Amendment’s protection (as it apparently does, see Davis, 547 U. S., at 819-820; id., at 840, n. 5 (Thomas, J., concurring in judgment in part and dissenting in part)), then the analysts’ testimony should be subject to confrontation as well.
C
Respondent claims that there is a difference, for Confrontation Clause purposes, between testimony recounting historical events, which is “prone to distortion or manipulation,” and the testimony at issue here, which is the “resul[t] of neutral, scientific testing.” Brief for Respondent 29. Relatedly, respondent and the dissent argue that confrontation of forensic analysts would be of little value because “one would not reasonably expect a laboratory professional ... to feel quite differently about the results of his scientific test by having to look at the defendant.” Id., at 31 (internal quotation marks omitted); see post, at 339.
This argument is little more than an invitation to return to our overruled decision in Roberts, 448 U. S. 56, which held that evidence with “particularized guarantees of trustworthiness” was admissible notwithstanding the Confrontation Clause. Id., at 66. What we said in Crawford in response to that argument remains true:
“To be sure, the Clause’s ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination....
“Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial be *318 cause a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.” 541 U. S., at 61-62.
Respondent and the dissent may be right that there are other ways — and in some cases better ways — to challenge or verify the results of a forensic test.[5] But the Constitution guarantees one way: confrontation. We do not have license to suspend the Confrontation Clause when a preferable trial strategy is available.
Nor is it evident that what respondent calls “neutral scientific testing” is as neutral or as reliable as respondent suggests. Forensic evidence is not uniquely immune from the risk of manipulation. According to a recent study conducted under the auspices of the National Academy of Sciences, “[t]he majority of [laboratories producing forensic evidence] are administered by law enforcement agencies, such as police departments, where the laboratory administrator reports to the head of the agency.” National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward 183 (2009) (hereinafter National Academy Report). And “[b]ecause forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case, they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency.” Id., at 23-24. A forensic analyst responding to a request from a law enforcement official may feel pressure — or have an incentive — to alter the evidence in a manner favorable to the prosecution.
Confrontation ,is one means of ensuring accurate forensic analysis. While it is true, as the dissent notes, that an honest analyst will not alter his testimony when forced to confront the defendant, post, at 339, the same cannot be said of the fraudulent analyst. See Brief for National Innocence *319 Network as Amicus Curiae 15-17 (discussing cases of documented “drylabbing” where forensic analysts report results of tests that were never performed); National Academy Report 44-48 (discussing documented cases of fraud and error involving the use of forensic evidence). Like the eyewitness who has fabricated his account to the police, the analyst who provides false results may, under oath in open court, reconsider his false testimony. See Coy v. Iowa, 487 U. S. 1012, 1019 (1988). And, of course, the prospect of confrontation will deter fraudulent analysis in the first place.
Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well. Serious deficiencies have been found in the forensic evidence used in criminal trials. One commentator asserts that “[t]he legal community now concedes, with varying degrees of urgency, that our system produces erroneous convictions based on discredited forensics.” Metzger, Cheating the Constitution, 59 Vand. L. Rev. 475, 491 (2006). One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases. Garrett & Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va. L. Rev. 1, 14 (2009). And the National Academy Report concluded:
“The forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country.” National Academy Report, at xx.[6]
*320 Like expert witnesses generally, an analyst’s lack of proper training or deficiency in judgment may be disclosed in cross-examination.
This case is illustrative. The affidavits submitted by the analysts contained only the bare-bones statement that “[t]he substance was found to contain: Cocaine.” App. to Pet. for Cert. 24a, 26a, 28a. At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed. While we still do not know the precise tests used by the analysts, we are told that the laboratories use “methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs,” App. to Brief for Petitioner la-2a. At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination. See 2 P. Giannelli & E. Imwinkelried, Scientific Evidence §23.03[c], pp. 532-533, and ch. 23A, p. 607 (4th ed. 2007) (identifying four “critical errors” that analysts may commit in interpreting the results of the commonly used gas chromatography/mass spectrometry analysis); Shellow, The Application of Daubert to the Identification of Drugs, 2 Shepard’s Expert & Scientific Evidence Quarterly 593, 600 (1995) (noting that while spectrometers may be equipped with computerized matching systems, “forensic analysts in crime laboratories typically do not utilize this feature of the instrument, but rely exclusively on their subjective judgment”).
The same is true of many of the other types of forensic evidence commonly used in criminal prosecutions. “[T]here is wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and *321 numbers of potential errors, research, general acceptability, and published material.” National Academy Report 6-7. See also id., at 138-139, 142-143, 154-155 (discussing problems of subjectivity, bias, and unreliability of common forensic tests such as latent fingerprint analysis, pattern/ impression analysis, and toolmark and firearms analysis). Contrary to respondent’s and the dissent’s suggestion, there is little reason to believe that confrontation will be useless in testing analysts’ honesty, proficiency, and methodology— the features that are commonly the focus in the cross-examination of experts.
D
Respondent argues that the analysts’ affidavits are admissible without confrontation because they are “akin to the types of official and business records admissible at common law.” Brief for Respondent 35. But the affidavits do not qualify as traditional official or business records, and even if they did, their authors would be subject to confrontation nonetheless.
Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. See Fed. Rule Evid. 803(6). But that is not the case if the regularly conducted business activity is the production of evidence for use at trial. Our decision in Palmer v. Hoffman, 318 U. S. 109 (1943), made that distinction clear. There we held that an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad’s operations, it was “calculated for use essentially in the court, not in the business.” Id., at 114.[7] The analysts’ *322 certificates — like police reports generated by law enforcement officials — do not qualify as business or public records for precisely the same reason. See Rule 803(8) (defining public records as “excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel”).
Respondent seeks to rebut this limitation by noting that at common law the results of a coroner’s inquest were admissible without an opportunity for confrontation. But as we have previously noted, whatever the status of coroner’s reports at common law in England, they were not accorded any special status in American practice. See Crawford, 541 U. S., at 47, n. 2; Giles v. California, 554 U. S. 353, 399-400 (2008) (Breyer, J., dissenting); Note, Evidence — Official Records — Coroner’s Inquest, 65 U. Pa. L. Rev. 290 (1917).
The dissent identifies a single class of evidence which, though prepared for use at trial, was traditionally admissible: a clerk’s certificate authenticating an official record — or a copy thereof — for use as evidence. See post, at 347. But a clerk’s authority in that regard was narrowly circumscribed. He was permitted “to certify to the correctness of a copy of a record kept in his office,” but had “no authority to furnish, as evidence for the trial of a lawsuit, his interpretation of what the record contains or shows, or to certify to its substance or effect.” State v. Wilson, 141 La. 404, 409, 75 So. 95, 97 (1917). See also State v. Champion, 116 N. C. 987, 988-989, 21 S. E. 700, 700-701 (1895); 5 J. Wigmore, Evidence §1678 (3d ed. 1940). The dissent suggests that the fact that this exception was “‘narrowly circumscribed’” makes no difference. See post, at 348. To the contrary, it makes all the difference in the world. It shows that even the line of cases establishing the one narrow exception the dissent has been able to identify simultaneously vindicates the general rule applicable to the present case. A clerk could by affidavit authenticate or provide a copy of an other *323 wise admissible record, but could not do what the analysts did here: create a record for the sole purpose of providing evidence against a defendant.[8]
Far more probative here are those cases in which the prosecution sought to admit into evidence a clerk’s certificate attesting to the fact that the clerk had searched for a particular relevant record and failed to find it. Like the testimony of the analysts in this case, the clerk’s statement would serve as substantive evidence against the defendant whose guilt depended on the nonexistence of the record for which the clerk searched. Although the clerk’s certificate would qualify as an official record under respondent’s definition — it was prepared by a public officer in the regular course of his official duties — and although the clerk was certainly not a “conventional witness” under the dissent’s approach, the clerk was nonetheless subject to confrontation. See People v. Bromwich, 200 N. Y. 385, 388-389, 93 N. E. 933, 934 (1911); People v. Goodrode, 132 Mich. 542, 547, 94 N. W. 14, 16 (1903); Wigmore, supra, § 1678.[9]
*324 Respondent also misunderstands the relationship between the business-and-official-records hearsay exceptions and the Confrontation Clause. As we stated in Crawford: “Most of the hearsay exceptions covered statements that by their nature were not testimonial — for example, business records or statements in furtherance of a conspiracy.” 541 U. S., at 56. Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because — having been created for the administration of an entity’s affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial. Whether or not they qualify as business or official records, the analysts’ statements here — prepared specifically for use at petitioner’s trial — were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment.
E
Respondent asserts that we should find no Confrontation Clause violation in this case because petitioner had the ability to subpoena the analysts. But that power — whether pursuant to state law or the Compulsory Process Clause— is no substitute for the right of confrontation. Unlike the Confrontation Clause, those provisions are of no use to the defendant when the witness is unavailable or simply refuses to appear. See, e. g., Davis, 547 U. S., at 820 (“[The witness] was subpoenaed, but she did not appear at... trial”). Converting the prosecution’s duty under the Confrontation Clause into the defendant’s privilege under state law or the Compulsory Process Clause shifts the consequences of adverse-witness no-shows from the State to the accused. More fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court. Its value to the defendant is not replaced by a system in which the prosecution presents its evidence via ex parte af *325 fidavits and waits for the defendant to subpoena the affiants if he chooses.
F
Finally, respondent asks us to relax the requirements of the Confrontation Clause to accommodate the “'necessities of trial and the adversary process.’ ” Brief for Respondent 59. It is not clear whence we would derive the authority to do so. The Confrontation Clause may make the prosecution of criminals more burdensome, but that is equally true of the right to trial by jury and the privilege against self-incrimination. The Confrontation Clause — like those other constitutional provisions — is binding, and we may not disregard it at our convenience.
We also doubt the accuracy of respondent’s and the dissent’s dire predictions. The dissent, respondent, and its amici highlight the substantial total number of controlled-substance analyses performed by state and federal laboratories in recent years. But only some of those tests are implicated in prosecutions, and only a small fraction of those cases actually proceed to trial. See Brief for Law Professors as Amici Curiae 7-8 (nearly 95% of convictions in state and federal courts are obtained via guilty plea).[10]
Perhaps the best indication that the sky will not fall after today’s decision is that it has not done so already. Many States have already adopted the constitutional rule we an *326 nounce today,[11] while many others permit the defendant to assert (or forfeit by silence) his Confrontation Clause right after receiving notice of the prosecution’s intent to use a' forensic analyst’s report, id., at 13-15 (cataloging such state laws). Despite these widespread practices, there is no evidence that the criminal justice system has ground to a halt in the States that, one way or another, empower a defendant to insist upon the analyst’s appearance at trial. Indeed, in Massachusetts itself, a defendant may subpoena the analyst to appear at trial, see Brief for Respondent 57, and yet there is no indication that obstructionist defendants are abusing the privilege.
The dissent finds this evidence “far less reassuring than promised.” Post, at 356. But its doubts rest on two flawed premises. First, the dissent believes that those state statutes “requiring the defendant to give early notice of his intent to confront the analyst” are “burden-shifting statutes [that] may be invalidated by the Court’s reasoning.” Post, at 350, 356. That is not so. In their simplest form, notice- and-demand statutes require the prosecution to provide notice to the defendant of its intent to use an analyst’s report as evidence at trial, after which the defendant is given a period of time in which he may object to the admission of the evidence absent the analyst’s appearance live at trial. See, e. g., Ga. Code Ann. § 35-3-154.1 (2006); Tex. Code Crim. Proc. Ann., Art. 38.41, §4 (Vernon 2005); Ohio Rev. Code Ann. §2925.51(0 (Lexis 2006). Contrary to the dissent’s *327 perception, these statutes shift no burden whatever. The defendant always has the burden of raising his Confrontation Clause objection; notice-and-demand statutes simply govern the time within which he must do so. States are free to adopt procedural rules governing objections. See Wainwright v. Sykes, 433 U. S. 72, 86-87 (1977). It is common to require a defendant to exercise his rights under the Compulsory Process Clause in advance of trial, announcing his intent to present certain witnesses. See Fed. Rules Crim. Proc. 12.1(a), (e), 16(b)(1)(C); Comment, Alibi Notice Rules: The Preclusion Sanction as Procedural Default, 51 U. Chi. L. Rev. 254, 254-255, 281-285 (1984) (discussing and cataloging state notice-of-alibi rules); Taylor v. Illinois, 484 U. S. 400, 411 (1988); Williams v. Florida, 399 U. S. 78, 81-82 (1970). There is no conceivable reason why he cannot similarly be compelled to exercise his Confrontation Clause rights before trial. See Hinojos-Mendoza v. People, 169 P. 3d 662, 670 (Colo. 2007) (discussing and approving Colorado’s notice-and-demand provision). Today’s decision will not disrupt criminal prosecutions in the many large States whose practice is already in accord with the Confrontation Clause.[12]
Second, the dissent notes that several of the state-court cases that have already adopted this rule did so pursuant to our decision in Crawford, and not “independently ... as a matter of state law.” Post, at 356. That may be so. But in *328 assessing the likely practical effects of today’s ruling, it is irrelevant why those courts adopted this rule; it matters only that they did so. It is true that many of these decisions are recent, but if the dissent’s dire predictions were accurate, and given the large number of drug prosecutions at the state level, one would have expected immediate and dramatic results. The absence of such evidence is telling.
But it is not surprising. Defense attorneys and their clients will often stipulate to the nature of the substance in the ordinary drug case. It is unlikely that defense counsel will insist on live testimony whose effect will be merely to highlight rather than cast doubt upon the forensic analysis. Nor will defense attorneys want to antagonize the judge or jury by wasting their time with the appearance of a witness whose testimony defense counsel does not intend to rebut in any fashion.[13] The amicus brief filed by district attorneys in support of the Commonwealth in the Massachusetts Supreme Judicial Court case upon which the Appeals Court here relied said that “it is almost always the case that [analysts’ certificates] are admitted without objection. Generally, defendants do not object to the admission of drug certificates most likely because there is no benefit to a defendant from such testimony.” Brief for District Attorneys in Support of the Commonwealth in No. SJC-09320 (Mass.), p. 7 (footnote omitted). Given these strategic considerations, and in light of the experience in those States that already provide the same or similar protections to defendants, there is little reason to believe that our decision today will commence the parade of horribles respondent and the dissent predict.
*329 * * *
This case involves little more than the application of our holding in Crawford v. Washington, 541 U. S. 36. The Sixth Amendment does not permit the prosecution to prove its ease via ex parte out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error.[14] We therefore reverse the judgment of the Appeals Court of Massachusetts and remand the case for further proceedings not inconsistent with this opinion.

It is so ordered.

 Contrary to the dissent’s suggestion, post, at 332-333, 335-336 (opinion of Kennedy, J.), we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution’s ease. While the dissent is correct that “[i]t is the obligation of the prosecution to establish the chain of custody,” post, at 335, this does not mean that everyone who laid hands on the evidence must be called. As stated in the dissent’s own quotation, post, at 336, from United States v. Lott, 854 F. 2d 244, 250 (CA7 1988), “gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.” It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony is introduced must (if the defendant objects) be introduced live. Additionally,, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records. See infra, at 321-322, 324.

 The exception is a single pre-Roberts case that relied on longstanding Massachusetts precedent. See Commonwealth v. Harvard, 356 Mass. 452, 462, 253 N. E. 2d 346, 352 (1969). Others are simply irrelevant, since they involved medical reports created for treatment purposes, which would not be testimonial under our decision today. See, e. g., Baber v. State, 775 So. 2d 258, 258-259 (Fla. 2000); State v. Garlick, 313 Md. 209, 223-225, 545 A. 2d 27, 34-35 (1988).

 The right to confrontation may, of course, be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections. See infra, at 327.

 Respondent cites our decision in Gray v. Maryland, 523 U. S. 185 (1998). That case did indeed distinguish between evidence that is “incriminating on its face” and evidence that “bec[omes] incriminating . . . only when linked with evidence introduced later at trial,” id., at 191 (internal quotation marks omitted). But it did so for the entirely different purpose of determining when a nontestifying codefendant’s confession, redacted to remove all mention of the defendant, could be admitted into evidence with instruction for the jury not to consider the confession as evidence against the noneonfessor. The very premise of the case was that, without the limiting instruction even admission of a redacted confession containing evidence of the latter sort would have violated the defendant’s Sixth Amendment rights. See id., at 190-191.

 Though surely not always. Some forensic analyses, such as autopsies and breathalyzer tests, cannot be repeated, and the specimens used for other analyses have often been lost or degraded.

 Contrary to the dissent’s suggestion, post, at 351, we do not “rel[y] in such great measure” on the deficiencies of crime-lab analysts shown by this report to resolve the constitutional question presented in this case. The analysts who swore the affidavits provided testimony against Melendez-Diaz, and they are therefore subject to confrontation; we would reach the same conclusion if all analysts always possessed the scientific *320 acumen of Mme. Curie and the veracity of Mother Teresa. We discuss the report only to refute the suggestion that this category of evidence is uniquely reliable and that cross-examination of the analysts would be an empty formalism.

 The early common-law eases likewise involve records prepared for the administration of an entity’s affairs, and not for use in litigation. See, e. g., King v. Rhodes, 1 Leach 24, 168 Eng. Rep. 115 (1742) (admitting into evidence ship’s musterbook); King v. Martin, 2 Camp. 100, 101, 170 Eng. Rep. 1094, 1095 (1809) (vestrybook); King v. Aickles, 1 Leach 390, 391-392, 168 Eng. Rep. 297, 298 (1785) (prison logbook).

 The dissent’s reliance on our decision in Dowdell v. United States, 221 U. S. 325 (1911), see post, at 348-349, is similarly misplaced. As the opinion stated in Dowdell — and as this Court noted in Davis v. Washington, 547 U. S. 813, 825 (2006) — the judge and clerk who made the statements at issue in Dowdell were not witnesses for purposes of the Confrontation Clause because their statements concerned only the conduct of defendants’ prior trial, not any facts regarding defendants’ guilt or innocence. 221 U. S., at 330-331.

 An earlier line of 19th-century state-court cases also supports the notion that forensic analysts’ certificates were not admitted into evidence as public or business records. See Commonwealth v. Waite, 93 Mass. 264, 266 (1865); Shivers v. Newton, 45 N. J. L. 469, 476 (Sup. Ct. 1883); State v. Campbell, 64 N. H. 402, 403, 13 A. 585, 586 (1888). In all three cases, defendants — who were prosecuted for selling adulterated milk — objected to the admission of the state chemists’ certificates of analysis. In all three eases, the objection was defeated because the chemist testified live at trial. That the prosecution came forward with live witnesses in all three eases suggests doubt as to the admissibility of the certificates without opportunity for cross-examination.

 The dissent provides some back-of-the-envelope calculations regarding the number of court appearances that will result from today's ruling. Post, at 342. Those numbers rely on various unfounded assumptions: that the prosecution will place into evidence a drug analysis certificate in every case; that the defendant will never stipulate to the nature of the controlled substance; that even where no such stipulation is made, every defendant will object to the evidence or otherwise demand the appearance of the analyst. These assumptions are wildly unrealistic, and, as discussed below, the figures they produce do not reflect what has in fact occurred in those jurisdictions that have already adopted the rule we announce today.

 State v. Johnson, 982 So. 2d 672, 680-681 (Fla. 2008); Hinojos-Mendoza v. People, 169 P. 3d 662, 666-667 (Colo. 2007); State v. Birchfield, 342 Ore. 624, 631-632, 157 P. 3d 216, 220 (2007); State v. March, 216 S. W. 3d 663, 666-667 (Mo. 2007); Thomas v. United States, 914 A. 2d 1, 12-13 (D. C. 2006); State v. Caulfield, 722 N. W. 2d 304, 310 (Minn. 2006); Las Vegas v. Walsh, 121 Nev. 899, 904-906, 124 P.3d 203, 207-208 (2005); People v. McClanahan, 191 Ill. 2d 127, 133-134, 729 N. E. 2d 470, 474-475 (2000); Miller v. State, 266 Ga. 850, 854-855, 472 S. E. 2d 74, 78-79 (1996); Barnette v. State, 481 So. 2d 788, 792 (Miss. 1985).

 As the dissent notes, post, at 355, some state statutes “requir[e] defense counsel to subpoena the analyst, to show good cause for demanding the analyst’s presence, or even to affirm under oath an intent to cross-examine the analyst.” We have no occasion today to pass on the constitutionality of every variety of statute commonly given the notice-and-demand label. It suffices to say that what we have referred to as the “simplest form [of] notice-and-demand statutes,” supra, at 326, is constitutional; that such provisions are in place in a number of States; and that in those States, and in other States that require confrontation without notice-and-demand, there is no indication that the dire consequences predicted by the dissent have materialized.

 Contrary to the dissent’s suggestion, post, at 352-353, we do not east aspersions on trial judges, who we trust will not be antagonized by good-faith requests for analysts’ appearance at trial. Nor do we expect defense attorneys to refrain from zealous representation of their clients. We simply do not expect defense attorneys to believe that their clients’ interests (or their own) are furthered by objections to analysts’ reports whose conclusions counsel have no intention of challenging.

 We of course express no view as to whether the error was harmless. The Appeals Court of Massachusetts did not reaeh that question, and we decline to address it in the first instance. Cf. Coy v. Iowa, 487 U. S. 1012, 1021-1022 (1988). In connection with that determination, however, we disagree with the dissent’s contention, post, at 353, that “only an analyst’s testimony suffices to prove [the] fact” that “the substance is cocaine.” Today’s opinion, while insisting upon retention of the confrontation requirement, in no way alters the type of evidence (including circumstantial evidence) sufficient to sustain a conviction.