RUCKER, J.,
dissenting.
Before Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) as applied in the recent United States Supreme Court decision of Melendez-Diaz v. Massachusetts, 557 U.S. ---, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), I would have agreed with the majority that a defendant's opportunity to eross-examine "a supervisor with direct involvement in the laboratory's technical processes ..." was sufficient to satisfy the demands of the Sixth Amendment. Op. at 708. Indeed this jurisdiction has historically admitted documents and testimony containing laboratory results from witnesses other than the experts who actually performed the tests or analyses. See, e.g., Ealy v. State, 685 N.E.2d 1047, 1055 (Ind.1997) (holding that an autopsy report was properly admitted under the public records exception to the hearsay rule); Thompson v. State, 270 Ind. 442, 386 N.E.2d 682, 684 (1979) (holding that an autopsy report was properly admitted under the business records exception to the hearsay rule although the doctor who prepared the report did not sponsor the report at trial and reasoning that the business records exception "does not mean that a sponsor of an exhibit must have personally made it, filed it, or have had first-hand knowledge of the transaction represented by it."); Fowler v. Napier, 663 N.E.2d 1197, 1200 (Ind.Ct.App.1996) (holding that DNA test results prepared by one doctor and presented at trial by another were properly admitted under the business records exception to the hearsay rule) However, Melendes-Dioz seems to point in a different direction thus casting considerable doubt on the continued validity of the foregoing authority.
To be sure Melendez-Diaz is not as clear as it could have been in identifying who must testify at trial. As the majority correctly observes, "[the justices of the Supreme Court wrestled some on this question...." Op. at 708. But to support its contention that the prosecutor may introduce into evidence documents prepared by the actual analyst, through a supervisor, the majority relies on certain isolated passages from the Melendez-Diaz opinion. For example the majority points to comments that not "everyone who laid hands on the evidence must be called" and that "the Confrontation Clause leaves discretion with the prosecution on which evidence to present." Op. at 707 (citing Melendez-Diaz, 129 S.Ct. at 2532 n. 1). However, these comments were directed *710 at a very narrow proposition concerning chain of custody and not the broader proposition the majority here advances[2] Indeed immediately preceding the footnoted comment on which the majority relies, the Court was unequivocal: "Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to 'be confronted with' the analysts at trial." Id. at 2582 (emphasis in original) (quoting Crawford, 541 U.S. at 54, 124 S.Ct. 1854).
Also, contrasting the facts in Melendez, Diaz to the facts here, the majority notes that the Court described the affidavits in that case as a "bare-bones statement" and that the defendant in that case "did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed." Op. at 708 (quoting Melendez, Diaz, 129 S.Ct. at 2537). Again, however, these comments must be taken in context. The Court itself described them as "Mlus-trative" of its main point which was "(llike expert witnesses generally, an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination." Id. at 2537. As the Court also observed, "Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." Id.
The record is clear that it was Ms. Powers who examined an aborted fetus specimen and buccal swabs taken from C.D., and blood samples apparently taken from defendant Richard Pendergrass, Tr. at 138-42. It was Ms. Powers who conducted a "PCR or polymerase chain reaction" test, Tr. at 124, and ultimately created DNA profiles that were then forwarded to Dr. Conneally of the Indiana University Medical Center for paternity analysis. Tr. at 127, 142. Although the State Police laboratory is qualified to create a DNA profile, it apparently is not qualified to conduct a paternity analysis. Tr. at 127. In any event the "Certificate of Analysis"-a two-page document identifying the evidence received by the laboratory and a summary of the test results-prepared by Ms. Powers and a document entitled "Profiles for Paternity Analysis"-a one-page document detailing the test results-also prepared by Ms. Powers, were admitted into evidence through the testimony of Ms. Powers' supervisor, Ms. Black. It was on the basis of the Profiles for Paternity Analysis that Dr. Conneally reached his conclusion that Pendergrass was the father of the aborted fetus. But, Ms. Powers was never subjected to the rigors of cross-examination on either the examination she per *711 formed, the testing she conducted, or the results she reached.
The record shows that Ms. Black testified at length about DNA evidence generally and the specific procedures her office used to map DNA. As to her role, Ms. Black testified, "As the supervisor obviously I supervise nine people. I review their work. I make the case assignments. I make sure the quality control of the entire unit is what it's supposed to be." Tr. at 121. She further testified:
I do regular reviews of their case work. I do some technical-all DNA ease work has to be reviewed by another qualified analyst which is a technical review. I do some of those. I also do some administrative reviews which means then after it's been technically reviewed they are administratively reviewed. I also do quarterly. I do just the regular-randomly pull cases out and review again for the quality of the work. And I can do all of those on any particular case of my choice.
Tr. at 122. Ms. Black testified that she recalled the particular case of Richard Pendergrass, that she reviewed the testing in that case, and that she indicated that review by writing her four digit number on the bottom. Tr. at 126-27, 131. Specifically she said, "Those are my initials that I confirmed that this paperwork that Ms. Powers was providing to Dr. Conneally was an accurate representation of her results." Tr. at 179.
There is no evidence Ms. Black did anything more than rubber stamp the results of Ms. Powers' work. And the question thus presented is whether those results are in fact accurate. Ms. Black did not testify that she observed Ms. Powers perform any examination of the laboratory specimens or conduct any tests. Obviously Ms. Black could not testify whether Ms. Powers diverged from standard laboratory procedures or how carefully or competently she performed the specific analyses. Although a supervisor might be able to testify to her charge's general competence or honesty, this is no substitute for a jury's first-hand observations of the analyst that performs a given procedure; and a supervisor's initials are no substitute for an analyst's opportunity to carefully consider, under oath, the veracity of her results. "Confrontation is one means of assuring accurate forensic analysis." Melendes-Diaz, 129 S.Ct. at 2536.
In sum, despite whatever ambiguity Melendez-Diaz may have created on the question of who must testify at trial, it appears to me the opinion is clear enough that a defendant has a constitutional right to confront at the very least the analyst that actually conducts the tests. "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." Id. at 2531 (citing Crawford, 541 U.S. at 54, 124 S.Ct. 1354). Because Ms. Powers did not appear at trial, and because there was no - evidence of her unavailability or a prior opportunity for Pendergrass to cross-examine her, the trial court erred by admitting into evidence Ms. Powers' testimony by way of the Certificate of Analysis and Profiles for Paternity Analysis. I therefore respectfully dissent on this issue.
BOEHM, J., concurs.

. The full quote follows:
Contrary to the dissent's suggestion ... we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While the dissent is correct that "(ilt is the obligation of the prosecution to establish the chain of custody," ... this does not mean that everyone who laid hands on the evidence must be called. As stated in the dissent's own quotation, ... "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony is introduced must (if the defendant objects) be introduced live. Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontesti-monial records.
Melendez-Diaz, 129 S.Ct. at 2532 n. 1 (internal citations omitted) (alteration and emphasis in original).