STATE OF NORTH CAROLINA v. LAKENDRA SHERRELL GRADY, Defendant

No. COA09-823

(Filed 17 August 2010)

**Constitutional Law— right to confrontation—testimony about DNA testing done by another agent—harmless error**

> The trial court did not err in a first-degree murder and first-degree burglary case by admitting testimony by an SBI special agent about the results of DNA testing that had been conducted by another agent who did not testify. Even if the admission was error, it was harmless beyond a reasonable doubt based on the evidence's very limited probative impact and the overwhelming evidence of defendant's guilt.

Appeal by defendant from judgment entered 10 October 2008 by Judge Jerry Cash Martin in New Hanover County Superior Court. Heard in the Court of Appeals 14 January 2010.

*Attorney General Roy Cooper, by Special Deputy Attorney General Steven M. Arbogast, for the State.*

*Glover & Petersen, P.A., by James R. Glover, for defendant-appellant.*

GEER, Judge.

Defendant Lakendra Sherrell Grady appeals her conviction of first degree murder and first degree burglary. Defendant's sole contention on appeal is that the trial court erred in admitting testimony by an SBI special agent about the results of DNA testing that had been conducted by another agent who did not testify. Defendant argues that the admission of this testimony deprived defendant of her constitutional right of confrontation in violation of *Melendez-Diaz v. Massachusetts*, 577 U.S. 305, 174 L. Ed. 2d 314, 129 S. Ct. 2527 (2009). We conclude, however, that the admission of the testimony, even if error, was harmless beyond a reasonable doubt because of the evidence's very limited probative impact and the overwhelming evidence of defendant's guilt.

Facts

The State's evidence tended to show the following. On 21 January 2006, Johnny Odell Southerland, Jr. was telling people he had found a silver and black 9mm handgun in a field across from a school and

STATE v. GRADY

[206 N.C. App. 566 (2010)]

wanted to sell it. He offered to sell it to defendant for $250.00 if she met him later that day. In the late afternoon or early evening, defendant and Delicia "Dee-Dee" Hardwrich drove to Southerland's apartment, and defendant asked Southerland to show her the gun. When Southerland handed the gun to defendant in her car, defendant told him that "he was beat" and drove off without paying for the gun.

The next day, a group of people gathered at Hardwrich's sister's home. While they were playing the Grand Theft Auto video game, two of the men—Rufus Lamar Bowser and Darion Graham—indicated that they "had guns like on the game." Because Hardwrich did not believe them, they showed her the guns. Bowser had a Tec-9 assault rifle, and Graham had a .357 pistol. Hardwrich called defendant and told her that "they got this Tec-9 and you should come see it and you should bring the gun you got yesterday." Later, defendant arrived at Hardwrich's sister's house with the 9mm handgun. Eventually, the group's conversation turned to the possibility of robbing someone. Defendant mentioned that she knew Pervis Owens, Jr. and that he had "a lot of money and stuff."

After midnight, defendant left the house with Bowser, Graham, and Maurice Miller. At this point, Bowser had the Tec-9, Graham had the .357 pistol, and it was unclear who had the 9mm handgun. Defendant drove them around as they tried to find someone to rob. Defendant, Graham, and Miller wanted to rob a man named Nate, but Bowser said "no, he cool," so they kept driving. Next, they wanted to rob a local "gambling house," but when they found no one there, they left.

Bowser then turned to defendant and asked, "What about the dude you was talking about earlier?" Defendant responded, "That's the one I'm about to call right now." Defendant called Owens as they drove toward his house, but he did not answer the phone. When they arrived at his house, a lot of people were outside. They drove down another street, parked, and waited. Defendant kept trying to call Owens and eventually made contact.

Meanwhile, everyone in the car agreed that defendant would convince Owens to come outside his house. The three males, who would be waiting behind another house, would "rush" Owens when he came outside. Bowser still had the Tec-9, Graham had the .357 pistol, and Miller was in possession of the 9mm handgun. After Owens refused to leave his house, defendant told the others: "I go in the house, y'all come in and tell him to give it up." She said she would

leave the door open for them, but told them to wait about five minutes before entering.

A few minutes after defendant went inside Owens' house, Bowser and Miller followed with their faces covered with their shirts. Graham waited outside. When the men got inside, they found Owens asleep in a living room chair. Bowser cocked his gun and told Owens to "get up." Owens screamed, "No," and rushed at Bowser, knocking him to the ground. Bowser got to his feet and ran out of the house. As he was running, he heard a shot. When Miller came out of the house, he said, "[G]o," and the three males ran to Graham's house. Defendant arrived at Graham's house about 10 to 15 minutes later and told them that Owens was dead.

Later that morning, at about 7:00 a.m., Rose Samuel, Owens' next door neighbor, went outside and found Owens lying in front of his house. Although Samuel had heard a gunshot a little after 5:00 a.m., she had ignored it because she lived in a "bad neighborhood" and was accustomed to hearing gunshots. Samuel or someone else called 911. Owens had a weak pulse when the paramedics first checked him, but he had no vital signs by the time he was loaded into the ambulance. Owens was pronounced dead at the hospital at 7:44 a.m.

Dr. William Kelly performed Owens' autopsy. Dr. Kelly determined that Owens suffered a single gunshot wound that entered his left back in the left shoulder area. The bullet traveled left to right and downward, traversing his chest, penetrating the top of the left lung, and passing through the aorta and into the right lung before exiting the chest and lodging in his right arm. Dr. Kelly determined that Owens had bled to death.

Approximately one week after Owens' death, Detectives Andrew Korwatch and Chris Adams of the Wilmington Police Department spoke with Graham. As a result of their conversation, Graham turned over the 9mm handgun. Special Agent Jessica Rosenberg, an SBI firearms and toolmark technician, compared a bullet and shell casing test-fired from the 9mm handgun to the bullet recovered from Owens' body and a shell casing found by officers at Owens' house. Special Agent Rosenberg determined that the test-fired shell casing and the shell casing obtained from the crime scene were both fired from the 9mm handgun obtained from Graham. The bullets had similar characteristics, but the agent could not say that the 9mm handgun had in fact fired the bullet recovered from Owens' body.

Detective Lee Odham also reviewed a surveillance tape taken from Samuel's house—Samuel had installed a surveillance camera on her porch that fed to a VCR in her house. The audio of the camera had recorded a gunshot and a screen door slamming, as well as Owens saying, "No." Detective Odham testified that another voice could be heard saying "'Bro, Bro, where's your phone, Bro,' something to that effect." After receiving information that defendant was involved, Detective Odham brought Hardwrich to the police station. Hardwrich identified the voice on the tape as being defendant's, although, at trial, Hardwrich denied doing so.

Defendant was then brought in for questioning. Because she was 17, she was read her *Miranda* rights and given the required juvenile warnings. After indicating that she understood her rights, defendant made both oral and written statements—the interrogation was also videotaped. She admitted getting the 9mm handgun from Southerland. When it came to what happened inside Owens' house, she gave three different versions of what transpired. In the third version, she said that she, Bowser, Graham, and Miller "made a plan to rob Mr. Owens." Defendant explained that she went inside Owens' house and that the others were to come in five minutes later. Bowser entered the house first, with his Tec-9, and Miller followed with the 9mm handgun. There was a struggle inside the house, and Miller ended up shooting Owens. Everyone then ran away, including Graham, who had remained outside the house during the struggle and shooting. Defendant confirmed that these events occurred sometime between 5:15 and 5:20 a.m. on the morning of 23 January 2006.

Defendant was subsequently indicted for first degree burglary, robbery with a dangerous weapon, and first degree murder. At trial, Bowser, who had pled guilty to second degree murder and armed robbery in exchange for testifying, testified essentially consistent with the above. Hardwrich testified that defendant had taken the gun from Southerland, but also testified that defendant had not left with Bowser, Graham, and Miller. Southerland also testified, admitting that he told defendant he had a gun to sell and suggested she meet him at a particular location that night. Southerland testified that a car did arrive at that location and that he showed the gun to a woman in the car who took the gun without paying for it, saying, "You beat." Although he claimed at trial that he did not know whether the woman was defendant, he also admitted that he did not want to testify and that his testimony conflicted with what he had previously told Detective Odham. Defendant did not present any evidence at trial.

On 10 October 2008, the jury found defendant guilty of first degree burglary, robbery with a dangerous weapon, and first degree murder under the felony murder rule, with robbery with a dangerous weapon and first degree burglary as the underlying felonies. The court arrested judgment on the conviction of robbery with a dangerous weapon, combined for sentencing the convictions for first degree murder and first degree burglary, and sentenced defendant to a term of life imprisonment without parole. Defendant timely appealed to this Court.

## Discussion

At trial, the State presented the testimony of Special Agent Christy Fischer, an SBI analyst, regarding the results of DNA testing done on blood found in holes in the trigger of the 9mm handgun turned over by Graham. SBI Special Agent Jill Applebee had actually conducted the testing, but was no longer working for the SBI at the time of the trial. Special Agent Fischer testified that based on her review of Special Agent Applebee's report, she believed that Special Agent Applebee had complied with all the required procedures for the testing. Special Agent Fischer also testified that she agreed with the results of Special Agent Applebee's testing, which had concluded that the predominant DNA profile from the blood on the 9mm handgun did not match the DNA profile of Owens or any profile contained in the North Carolina convicted offender indexes.

On appeal, defendant argues that the United States Supreme Court's decision in *Melendez-Diaz v. Massachusetts*, 577 U.S. 305, 174 L. Ed. 2d 314, 129 S. Ct. 2527 (2009), establishes that the admission of this testimony violated her constitutional right to confrontation. Even assuming, *arguendo*, that the testimony was admitted in error, we hold that the State has established that any error was harmless beyond a reasonable doubt. *See* N.C. Gen. Stat. § 15A-1443(b) (2009) ("A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.").

Defendant gave both oral and written statements regarding the murder. In each of her three versions, she admitted being inside Owens' house when he was shot. In her final version, she admitted that she took Southerland's 9mm handgun, that she, Miller, Bowser, and Graham made a plan to rob Owens, that she entered Owens'

house first followed by Miller and Bowser (with Graham waiting out-side), and that Miller shot Owens with the 9mm handgun she had obtained. This confession was further supported by testimony from Bowser, Hardwrich, Southerland, and the firearms expert.

Although defendant notes various inconsistencies in the testimony, the evidence was essentially undisputed that defendant was present during the shooting. The conflicts in the evidence identified by defendant include the differing stories told by defendant; whether defendant took the 9mm handgun from Southerland or someone else stole it; whether there were serious conversations about robbing someone at Hardwrich's sister's home or just casual discussions; whether defendant left alone or with Bowser, Graham, and Miller; and discrepancies about the time of the shooting. The DNA evidence, however, was not pertinent to any of these conflicts in the evidence. The testing merely suggested that Owens was not connected with the gun and precluded an argument by the defense that the State had not followed every possible lead.

Defendant argues, however, that "[t]he results of the DNA testing done by Jill Applebee provided some support for the State's theory of the facts, that Owens [sic] death was the result of being shot about 5:15 a.m. by Maurice Miller, using a 9 mm [sic] pistol that Defendant Grady gave to him before he went in the house." We do not see how that is the case. The DNA evidence regarding the blood on the 9mm handgun's trigger did nothing to address the discrepancy about the time of the shooting and did not identify the shooter. Moreover, on the question of who provided Miller with the 9mm handgun, the fact that the testing did not match the blood to defendant supported defendant's suggestion at trial that she had not been the source of the 9mm handgun.

In sum, even if we accept *arguendo* defendant's view that the evidence was in serious conflict, our review of the record indicates that there is no plausible basis for concluding that the DNA testing played any material role in the jury's decision to convict defendant. We note that 27 witnesses testified for the State over five days at defendant's trial. Special Agent Fischer's testimony lasted approximately 16 minutes, and defendant has challenged only a portion of that testimony. The challenged portion did not shed any light on the overarching issue: whether defendant was a participant in the robbery and, therefore, also in the felony murder.

**ITS LEASING, INC. v. RAM DOG ENTERS., LLC**

[206 N.C. App. 572 (2010)]

Thus, absent the admission of the testimony, we conclude, beyond a reasonable doubt, that the jury would not have reached a different decision. *See State v. Locklear*, 363 N.C. 438, 453, 681 S.E.2d 293, 305 (2009) (finding Confrontation Clause violation harmless beyond reasonable doubt where "State presented copious evidence" of defendant's guilt); *State v. Galindo*, 200 N.C. App. 410, 415, 683 S.E.2d 785, 788-89 (2009) (finding Confrontation Clause violation harmless beyond reasonable doubt in light of "[d]efendant's own statement, in conjunction with the unchallenged testimony of law enforcement officers").

No error.

Judges CALABRIA and STEPHENS concur.