*294 OPINION OF THE COURT
James C. Harberson, Jr., J.
Issue
Following Crawford v Washington (541 US 36 [2004]), do Intoxilyzer calibration and breath alcohol simulator solution testing records qualify as “testimonial” for purposes of the Sixth Amendment, thereby requiring that their preparers be subject to cross-examination at trial?
Facts
Defendant, charged with driving while intoxicated and aggravated driving while intoxicated per Vehicle and Traffic Law § 1192 (2) and (2-a), moved pretrial to preclude on Confrontation Clause grounds intoxication evidence from the Datamaster Intoxilyzer showing her blood alcohol level to be .23%. She objects to the People’s attempt to establish the Datamaster’s reliability by using written certifications in lieu of live testimony. The first document in question (People’s exhibit 2) is a “CERTIFICATE OF PHOTOSTATIC COPY OF RECORD OF ANALYSIS — SIMULATOR SOLUTION” (CPLR 4518) signed by Inspector Gerald M. Zeosky, Director, New York State Police Crime Laboratories, Forensic Investigation Center, attaching a “CERTIFICATION OF ANALYSIS 0.10% BREATH ALCOHOL SIMULATOR SOLUTION” and purporting to establish that the simulator solution document is an exact photocopy of one made in the regular course of business of the crime laboratory and that it is the crime laboratory’s regular course of business to make such records at the time the events recorded in them occur or “within a reasonable time thereafter.” The simulator solution certificate provides that as of November 28, 2008, “[simulator solution lot number 08370 has been certified to contain the appropriate concentration of ethyl alcohol and is hereby approved for use” and is signed by Harry K. Garber and Keith K. Coonrod of the New York State Police Forensic Investigation Center.
The second (People’s exhibits 3, 4) is a notarized “CERTIFICATION PURSUANT TO CPLR 4518 OF RECORDS MAINTAINED IN THE REGULAR COURSE OF BUSINESS” sworn out by John R. Digman of the State of New York Division of Criminal Justice Services, Office of Public Safety, attaching a two-page “BREATH TEST INSTRUMENT OF RECORD OF *295 INSPECTION/MAINTENANCE/CALIBRATION” prepared by Michael J. Hess, a technician in the Office of Public Safety (presumably New York State’s) that purports to establish the successful testing and certification of the reliability of the Datamaster DMT serial No. 112906 per 10 NYCRR part 59 occurring on March 12, 2009. In the calibration certificate, Mr. Digman, the Assistant Director of the Office of Public Safety, certifies that copies of calibration records attached to it prepared by Mr. Hess are exact photocopies of the original records and that those calibration records were made in the regular course of business and at the time the testing was performed “or within a reasonable time thereafter.” Defendant contends that the Sixth Amendment requires the People to produce the authors of these documents for cross-examination and that failure to do so should preclude their admission and the Intoxilyzer evidence they support. The People maintain that such documents are admissible as business records pursuant to CPLR 4518. Both defendant’s motion and the People’s response were made orally.
Discussion
L
The Sixth Amendment’s Confrontation Clause “guarantees a defendant’s right to confront those ‘who “bear testimony” ’ against him.” (Melendez-Diaz v Massachusetts, 557 US —, —, 129 S Ct 2527, 2531 [2009], quoting Crawford v Washington, 541 US 36, 51 [2004]; see also US Const Amend VI.) Testimony includes, inter alia, “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use [later at] trial.” (Id., quoting Crawford at 52.)
At the same time, New York’s business records rule has long provided that documents kept in the regular course of business may be admitted in court notwithstanding hearsay concerns. It provides that
“[a]ny writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of that act, transaction, occurrence or event, if the judge finds that it was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, *296 transaction, occurrence or event, or within a reasonable time thereafter.” (CPLR 4518 [a]; see also People v Cratsley, 86 NY2d 81, 89 [1995] [summarizing section 4518 (a)’s requirements].)
IL
For reasons discussed below, the court finds that both the simulator solution and calibration records are testimonial for Sixth Amendment purposes and therefore inadmissable absent live testimony by those who prepared them. First, the calibration certification is clearly testimonial pursuant to Melendez-Diaz because it is “quite plainly” an affidavit like the documents at issue there:
“The documents at issue here, while denominated by Massachusetts law ‘certificates,’ are quite plainly affidavits: ‘declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths.’ Black’s Law Dictionary 62 (8th ed. 2004). They are incontrovertibly a ‘ “solemn declaration or affirmation made for the purpose of establishing or proving some fact.” ’ Crawford [u Washington], supra, at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)) . . . The ‘certificates’ are functionally identical to live, in-court testimony, doing ‘precisely what a witness does on direct examination.’ Davis v. Washington, 547 U. S. 813, 830 (2006) (emphasis deleted).” (Melendez-Diaz, 557 US at —, 129 S Ct at 2532.)
Additionally, both the calibration and solution testing records are clearly “made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use [later at] trial” and, as such, are testimonial. (See 557 US at —, 129 S Ct at 2531, quoting Crawford at 52; People v Heyanka, 25 Misc 3d 978, 979-980 [Suffolk Dist Ct 2009], citing 557 US at —, 129 S Ct at 2532 [“The (simulator solution and photocopy certification) reports at issue in this trial . . . were prepared with the reasonable expectation that they would be used in criminal prosecutions. The reports are testimonial in nature, and their admission into evidence, in the absence of the technician or analyst that prepared them, violates *297 the defendant’s Sixth Amendment right to confrontation” (25 Misc 3d at 980)].[1]
III
The court’s decision contradicts most other New York courts which have considered this issue. They have found both calibration and solution records nontestimonial for Confrontation Clause purposes. (See People v Kelly, 26 Misc 3d 1205[A], 2009 NY Slip Op 52664[U], *2-3 [Grim Ct, NY County 2009]; People v Brooks, 21 Misc 3d 1132[A], 2008 NY Slip Op 52323[U], *2-3 [Sup Ct, Bronx County 2008]; People v Lebrecht, 13 Misc 3d 45, 49-50 [App Term, 9th & 10th Jud Dists 2006]; People v Krueger, 9 Misc 3d 950, 953-957 [Lockport Just Ct 2005]; People v Fisher, 2005 Misc 3d 1121[A], 9 NY Slip Op 51726DJ], *6-9 [Rochester City Ct 2005]; People v Mellott, 10 Misc 3d 1056[A], 2005 NY Slip Op 51989DJ], *3-5 [Webster Just Ct 2005]; Green v DeMarco, 11 Misc 3d 451, 464-468 [Sup Ct, Monroe County 2005]; People v Kanhai, 8 Misc 3d 447, 449-453 [Crim Ct, Queens County 2005]; see also Handling the DWI Case in New York, part XI [“Evidence Issues”], § 43:25 [“Effect of Crawford v. Washington on admissibility of documents”] [West 2009].)
The rationale for denying the records testimonial status is threefold. First, they are nontestimonial because they are not prepared specifically for use in court or in gathering incriminating information against a particular individual. (See Lebrecht at 48 [citing cases].) Second, they are business records created systematically pursuant to state statute that are not aimed at a particular individual or prosecution and which memorialize execution of a ministerial duty not requiring judgment or opinion. (Id. [citing cases].) Third, the records provide only indirect or *298 foundational evidence against defendants: that is, evidence is only testimonial if it goes directly to establishing a fact used to prove a defendant’s guilt, not indirectly to establish the reliability of the devices used to adduce such facts:
“Contrary to defendant’s contention, not all scientific reports bearing some relevance to the case are testimonial. The calibration tests here do not accuse Mr. Kelly of a crime nor do they serve to prove an element of any of the charges against him. This differs significantly from scientific reports prepared specifically for the prosecution of a particular defendant.” (Kelly, 26 Mise 3d 1205[A], 2009 NY Slip Op 52664[U], *3 [2009].)
This analysis fails for several reasons. First, it ignores Crawford’s “prepared for litigation” language, which clearly implicates the documents in question. This definition does not discriminate between interrogation and calibration records, or between direct and indirect evidence.
Second, the business records rationale overlooks the fact that calibration (and solution testing) records are not typical business records. They are prepared expressly for use in litigation. New York requires certification of Intoxilyzers and simulator solutions precisely because evidence produced using them will end up in court (most likely criminal court) and the People want to ensure their accuracy for prosecutorial purposes. Such certificates are not like other business records such as sales entries or maintenance records for automobiles which have a remote chance of someday being subject to litigation and which are prepared by people indifferent to their use in litigation. One cannot avoid the testimonial nature of the evidence simply by systematizing its creation and collection. The Melendez-Diaz majority concurs:
“Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. See Fed. Rule Evid. 803(6). But that is not the case if the regularly conducted business activity is the production of evidence for use at trial. Our decision in Palmer v. Hoffman, 318 U. S. 109 (1943), made that distinction clear. There we held that an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad’s operations, it was ‘calculated for use essentially in the court, not in the business.’ *299 Id., at 114. The analysts’ certificates — like police reports generated by law enforcement officials — do not qualify as business or public records for precisely the same reason. See Rule 803 (8) (defining public records as ‘excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel’).” (Melendez-Diaz, 557 US at —, 129 S Ct at 2538 [footnote omitted].)
One could also contend, as the court in Green v DeMarco does, that the calibration and testing records are prepared for reasons other than litigation and therefore should enjoy business record protection. The Green court, in overturning a lower court ruling finding that such records are testimonial (People v Orpin, 8 Misc 3d 768 [Irondequoit Just Ct 2005]), observed that the Intoxilyzer maintenance and reference solution testing records “have a primary business purpose” apart from use in litigation:
“The first document at issue here is a portion of [a] maintenance record, showing that approximately three months before the subject arrest the breath testing instrument in question was serviced and certified as accurate. That the document has an incidental use as proof in court of the reliability of the instrument does not alter the fact that the document has a primary business purpose that would exist even in the absence of any litigation.
“Likewise, it is equally self-evident that the records maintained by the State Police with regard to its testing of reference solutions, such as those set forth in the second document at issue here, have a primary business purpose. The Division of State Police is solely responsible for obtaining and distributing the reference solutions that are utilized by the Office of Public Safety and police statewide to ensure the accuracy of the breath testing instruments they repair or use .... The random tests that the State Police perform serve the legitimate business purpose of quality assurance. The testing is done by the State Police in Albany before a lot is distributed if for no other reasons [sic] than to prevent the shipment of defective solutions, to eliminate the need for testing by the individual agencies involved, and to facilitate returns to the manufacturer should a problem be detected. The records kept by the State Police are mandated (10 NYCRR 59.5 [f]), as ‘memo *300 rials of the fact that the tests were made and what the results were.’ ([People v] Foster, 27 NY2d [47,] 52.) The certifications tell each distributee that the particular shipment they have received has been tested and is approved for use. In this court’s opinion, the business purposes served by these records would exist even in the absence of any litigation.” (11 Misc 3d at 464-465.)
That last statement could serve as the mantra of a rent-seeking bureaucrat who values process as an end in itself, regardless of outcome. These records are not created for their own sake; rather, their entire purpose is to help provide reliable evidence for prosecuting DWI suspects. But for the need to prove DWI in court, these procedures and records would not exist. As such, they are created specifically for litigation and therefore cannot be considered, per Melendez-Diaz, typical business records.[2]
The records in question also lack the presumption of neutrality typical business records enjoy because they are created by law enforcement personnel for law enforcement personnel and therefore may not be prepared with the same objectivity as records created by a third party truly indifferent to the outcomes of criminal prosecutions. Even if those State Police employees conducting the tests do not know the defendants against whom the records will be used, it is not unreasonable to assume, because they play for the same team, that they hope for convictions. Again, Melendez-Diaz-.
“Nor is it evident that what respondent calls ‘neutral scientific testing’ is as neutral or as reliable as respondent suggests. Forensic evidence is not uniquely immune from the risk of manipulation. According to a recent study conducted under the auspices of the National Academy of Sciences, ‘[t]he majority of [laboratories producing forensic evidence] are administered by law enforcement agencies, such as police departments, where the laboratory administrator reports to the head of the *301 agency.’ National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward 6-1 (Prepublication Copy Feb. 2009) (hereinafter National Academy Report). And ‘[b]ecause forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case, they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency.’ Id., at S-17. A forensic analyst responding to a request from a law enforcement official may feel pressure — or have an incentive — to alter the evidence in a manner favorable to the prosecution.
“Confrontation is one means of assuring accurate forensic analysis. While it is true, as the dissent notes, that an honest analyst will not alter his testimony when forced to confront the defendant, post, at — [129 S Ct at 2548], the same cannot be said of the fraudulent analyst. See Brief for National Innocence Network as Amicus Curiae 15-17 (discussing cases of documented ‘drylabbing’ where forensic analysts report results of tests that were never performed); National Academy Report 1-8 to 1-10 (discussing documented cases of fraud and error involving the use of forensic evidence). Like the eyewitness who has fabricated his account to the police, the analyst who provides false results may, under oath in open court, reconsider his false testimony. See Coy v. Iowa, 487 U. S. 1012, 1019 (1988). And, of course, the prospect of confrontation will deter fraudulent analysis in the first place.
“Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well. Serious deficiencies have been found in the forensic evidence used in criminal trials. One commentator asserts that ‘[t]he legal community now concedes, with varying degrees of urgency, that our system produces erroneous convictions based on discredited forensics.’ Metzger, Cheating the Constitution, 59 Vand. L. Rev. 475, 491 (2006). One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases. Garrett & Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va. L. Rev. 1, 14 (2009). And the National Academy
*302 Report concluded:
“ ‘The forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country.’ National Academy Report P-1 (emphasis in original).” (557 US at —, 129 S Ct at 2536-2537.)
Consider also the recent and shocking forensic analysis scandal at the New York State Police laboratory. According to a New York State Inspector General’s report released last month, State Police Forensic Scientist Garry Veeder
“while assigned to the State Police forensic laboratory in Albany, routinely failed to conduct a required test when examining fiber evidence, then falsely indicated in case records that he had performed the test. When, after an outside audit, laboratory management learned of Veeder’s violations, it conducted a flawed internal inquiry which summarily dismissed Veeder’s assertions that his misconduct was a product of deficient training and supervision possibly implicating the work of other laboratory trace evidence staff. In fact, the Inspector General ascertained that Veeder was substantially accurate in his statements to laboratory supervisors as his training and supervision were significantly deficient.
“The Inspector General determined that Veeder’s longstanding violations of laboratory protocol escaped detection because laboratory staffs technical, or peer, reviews of Veeder’s fiber examinations were substandard, overlooking obvious indications that Veeder had omitted the required fiber test. Notably, the scientist who was chosen by laboratory management to perform most of Veeder’s technical reviews was patently unqualified for this responsibility, having conducted only three fiber examinations in his career, none within the previous 10 years, and had been deemed unqualified to conduct fiber analysis after having failed his own proficiency test. As this disqualification was known or should have been known to laboratory supervisors prior to his appointment, conferring on him the duty of assessing Veeder’s aptitude and results was irresponsible.
“All 322 cases handled by Veeder from 1993 to 2008, *303 involving fiber and other types of trace evidence, subsequently were reviewed by a group of independent forensic experts retained by the State Police. The independent experts determined that 29 percent of Veeder’s cases were substantively deficient either in their conclusions or documentation, raising serious questions as to his competency.” (State of New York Office of the Inspector General, Report of Investigation of the Trace Evidence Section of the New York State Police Forensic Investigation Center, at 1-2 [2009], available at http://www.ig.state.ny.us/ pdfs/Report%20of%20Investigation%20of%20 the%20Trace%20Evidence%20Section%20of%20 the%20NYSP%20Forensic%20Investigation%20 Center.pdf; see also Jeremy W. Peters, New York Times, Dec. 17, 2009, at A33, available at http:// www.nytimes.com/2009/12/18/nyregion/18state police.html?_r=l&scp=l&sq=report%20condemns %20police%201ab%20oversight&st=cse.)
Additionally, the New York State Bar Association Task Force on Wrongful Convictions released last May a report detailing numerous cases highlighting shortcomings in DNA forensic analysis in New York going back more than 20 years and making recommendations for preventing them in the future. (Final Report of the New York State Bar Association’s Task Force on Wrongful Convictions, at 90-103 [2009], available at http:// www.nysba.org/Content/ContentFolders/TaskForceon WrongfulConvictions/FinalWrongfulConvictionsReport.pdf). The court is also reminded of the infamous Serrano case, in which ampoules produced by a Pennsylvania laboratory and used in New York breathalyzers were scientifically unreliable. {People v Serrano, 142 Mise 2d 1087, 1096 [Crim Ct, Kings County 1989].)
The court does not seek to cast aspersions upon the State Police or their technicians in making these observations but rather to underscore the fact that we must beware of putting too much trust in the man behind the curtain. Doing so threatens to undermine one of the fundamental trial protections defendants have enjoyed since this nation’s founding.

m

Defense’s motion to preclude is granted.

. The Melendez-Diaz majority excruciatingly avoids answering the question of whether or not its holding specifically covers calibration and testing records; instead, it winks at the issue:
“Contrary to the dissent’s suggestion, post, at —, — [129 S Ct at 2544-2545, 2546] (opinion of Kennedy, J.), we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution’s case . . . Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records. See infra, at —, — [129 S Ct at 2550-2551, 2552].” (Melendez-Diaz, 557 US at — n 1, 129 S Ct at 2532 n 1.)
However, given Crawford’s definition of “testimonial” statements and other holdings in Melendez-Diaz (discussed infra), this court is comfortable extending Confrontation Clause protections to the documents in question.

. It must be noted that, under New York law, even business records devised primarily for litigation receive business record protection so long as they have a secondary business purpose. (See e.g. Green v DeMarco, 11 Misc 3d 451, 462 [2005], citing People v Foster, 27 NY2d 47, 52 [1970]; People v Kanhai, 8 Misc 3d 447, 451 [2005], citing Foster at 52.) However, as noted above, the court cannot conceive of any reason for creating calibration and solution testing records other than for use in litigation.