**Commonwealth v. Dagutis**

508

C.P. of Bucks County, no. 7898-2008.

*Abigail Taylor Fillman,* for the Commonwealth.
*Suzette Sanders Adler,* for the defendant.

WAITE, *J.*, March 22, 2010—

## INTRODUCTION

This matter involves a charge and conviction of Brian Dagutis for driving under the influence (DUI) based primarily, although not exclusively, on the testimony of a consultant to a private, for-profit testing laboratory, over defense objections. The consultant in question was a former owner of the laboratory where the subject testing was done. There was no issue made regarding the skill and experience of the consultant in the field of forensic testing of blood for alcohol content (BAC). The determination of guilt that we made based on that evidence was called into question by the defendant/appellee

in post-trial motions. Upon consideration of a confluence of new and critical developments in decisional law almost simultaneously emanating from the United States Supreme Court and the Pennsylvania Supreme Court at about the time of our original decision, compelled us to decide that the evidence offered by the Commonwealth through its consultant was flawed.

In a case of first impression for the Pennsylvania Supreme Court on the issue of "at the time of driving" requirement for general impairment DUI charges obliged our reconsideration of Count I of the charges against appellee. The offense was borderline in respect to appellee's BAC, and the general observations of the arresting officers who conducted field sobriety tests were questionable in that they were not authorized or recognized by the National Highway Safety Administration of the U.S. Department of Transportation caused us to conclude that the evidence sans the BAC evidence was not sufficiently reliable and persuasive to support the finding of guilt beyond a reasonable doubt. Therefore, we reversed ourselves and found appellee not guilty.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

The Commonwealth filed the following statement of matters complained of on appeal, which we repeat verbatim as follows:

"(1) The trial court erred in substituting a judgment of not guilty despite the guilty verdict originally entered by the same.

"(2) The trial court erred in reassessing the credibility and weight of the evidence presented by the Common-

wealth expert, Dr. Siek, and the defense expert, Dr. Lage.

"(3) If the trial court intended to determine by its order that the evidence was insufficient, it failed to view the evidence in the light most favorable to the Commonwealth and incorrectly determined the evidence to be insufficient.

"(4) If the trial court intended to determine by its order that the verdict was contrary to the weight of the evidence, it abused its discretion and failed to grant a new trial."

## STANDARD OF REVIEW

In significant respects, the issue presented is one of statutory interpretation, which, as a question of law, is subject to a de novo standard of review in the appellate courts. *Commonwealth v. Segida,* 985 A.2d 871 (Pa. 2009) citing *Commonwealth v. Hoke,* 599 Pa. 587, 962 A.2d 664 (2009). "Pursuant to the Statutory Construction Act, our task in interpreting a statute is to ascertain and effectuate the intention of the General Assembly." *Id.* "The Statutory Construction Act admonishes that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.*

The trial court must be able and willing to review its own rulings in a matter of great importance to the litigants and to change its mind and correct legal errors if adequate grounds are presented by the moving party. Otherwise, the rules in respect to post-trial procedures are rendered hollow, meaningless and a useless exercise in futility.

Instead, we accept the invitation to review our ruling particularly where fundamental changes obtain in the field of evidence related to the issues appropriately raised and preserved by appellee.

The standard to be applied in reviewing the sufficiency of the evidence is whether viewing all the evidence properly admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Hutchinson,* 947 A.2d 800, 805-06 (Pa. Super. 2008), *appeal denied,* 2009 WL 2947378 (2009); *Commonwealth v. Andrulewicz,* 911 A.2d 162, 165 (Pa. Super 2006). It is not clear that this rule applies, as urged by the Commonwealth, with respect to the grant of post-trial motions, but our ultimate disposition is the same in either case.

After excluding certain factual conclusions and expert opinions rendered by the consultant, the remaining evidence was inconclusive and lacked the reliability essential to establish all the elements of the offenses charged. Therefore, we found that the Commonwealth did not sustain its burden of proof by the "beyond a reasonable doubt" standard. We considered all of the other evidence in the case from the entirety of the record and even evaluating it in the light most favorable to the Commonwealth to the logical extensions of that evidence and we still had a reasonable doubt. Thus, the conclusion that we reached in respect to the reversal of the verdict was commanded under all of the circumstances.

The issues raised by the appellant/Commonwealth are adequately dealt with as conflated.

## RELEVANT RECENT APPELLATE
## COURT DEVELOPMENTS

As noted, the subject case was before this court for decision on March 18, 2009. Within the ten-day time limit, appellee filed his post-trial motions. During the time of our consideration of those post-trial motions, on June 25, 2009, the United States Supreme Court decided *Melendez-Diaz v. Massachusetts,* 129 S.Ct. 2527 (2009). In general terms, Justice Antonin Scalia, writing for the majority, rejected the notion that in a drug trial, the prosecution may introduce certificates in the nature of affidavits of laboratory analysts, the contents of which provide that material seized by police was a controlled substance without calling the analyst who conducted the analytical procedures because the defendant's Sixth Amendment right of confrontation recognized in *Crawford v. Washington,* 541 U.S. 36 (2004) is violated thereby.

On January 25, 2010, the United States Supreme Court in *Briscoe v. Virginia,* 2010 WL 246152, 130 S.Ct. 1316 (2010), vacated a judgment of conviction of a drug suspect where the trial court held that the failure of a defendant to call the analyst who conducted the analytical procedures was a waiver of his Sixth Amendment right of confrontation. Per curiam, the Supreme Court vacated the lower court's decision as being inconsistent with the Court's opinion in *Melendez.*

Justice Scalia explained that the states have relied on the Supreme Court's decision in *Ohio v. Roberts,* 448 U.S. 56 (1980), holding that a certificate issued by a scientist conducting independent analytical services presented a sufficient indicia of reliability to permit its

use without the defendant's right to confront. Such analytical services were at that time considered to be sufficiently independent of the underlying criminal prosecution to render such reports as being "non-testimonial". The reports were also characterized as being "non-accusatory" in nature. However, the Supreme Court in *Melendez* now holds that the Sixth Amendment is not activated merely by the nature of it being testimonial or not but whether the witness is one who is testifying "against" the defendant's interest even if the witness is not "hostile" in the general sense to the defendant. Reliability is no longer the touchstone in that Sixth Amendment protections are procedural rather than a substantive guarantee and are designed to insure that reliability is assessed in such a way and in a particular manner of testing in the "crucible of cross-examination." And, as confirmed by the remand in *Briscoe v. Virginia (supra)*, the availability of compulsory process allowing the defendant to call the analyst does not satisfy Sixth Amendment requirements.

Furthermore, Sixth Amendment requirements cannot be circumvented by the argument that an analyst is a contemporaneous, non-testimonial witness of the non-conventional variety for the reason that the witness is not testifying about something he witnessed in the past and is now called upon to relate his observations. It was argued and rejected by the *Melendez* court that an analyst was observing the contemporaneous results of testing he was then performing. The reasoning of the Supreme Court was that the analyst was testing and preparing a certificate of something that occurred in the past just as any other conventional witness and the very nature of the certificate is for its use in court against the defendant.

The Supreme Court further observed that the indicia of reliability is not as secure as the members of the Supreme Court once believed. They now recognized that accepting such certificate/affidavits was accepting evidence at face value when that type of evidence was or could be prone to distortion or manipulation and therefore was not the type of evidence that one should accept as the inherent result of neutral scientific testing.

The U.S. Supreme Court's reasoning and rationale applies with equal force to analysts testifying through state sanctioned certificates like those utilized in the instant matter. Importantly, the issue in prosecutions for section (a)(2) offenses, in large part comes down to whether the toxicology report reveals a BAC of .08 or more within two hours of driving. The processes and procedures by which that BAC is determined is the only significant issue for determination.

In respect to the Pennsylvania Supreme Court's decision that played a role in our instant decision, on December 29, 2009 that court filed its opinion in *Commonwealth v. Segida,* 985 A.2d 871 (Pa. 2009), a case of first impression interpreting and constructing subsection (a)(1) of the DUI statute enacted in 2003. The court found that the general impairment section of the statute required the Commonwealth to prove that the defendant was under the influence while he was driving as opposed to having the prohibited quantity of alcohol in his system within two hours of driving. The court acknowledged that there is a certain level of relation back evidence that must be considered, but restricted that kind of evidence to "relative immediacy".

Due to the U.S. Supreme Court's restriction on the admissibility of hearsay certificates on BAC in respect

to the level of alcohol within the "two hour" window and the relative paucity and questionable quality of the field sobriety testing done in the instant matter in respect to the general impairment count, we were compelled to grant appellee's post-trial motions.

## DISCUSSION

The statute in question in the instant matter provides at subsection (a)(1) as charged in Count I of the information, that an operator of a motor vehicle is guilty of DUI when the following is violated:

"*(a) General impairment.-*

"(1) An individual *may not drive,* operate or be in actual physical control of the movement of a vehicle *after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving,* operating or being in actual physical control of the movement of the vehicle." (emphasis added)

Subsection (a)(2) as charged in Count II provides:

"(2) An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.08 percent but less than 0.10 percent within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle."

This matter came before this court for a bench trial at which the two arresting officers testified along with the Commonwealth's expert witness/toxicologist and appellee's expert pharmacologist. The Commonwealth called

Dr. Siek and identified him as a toxicologist who was the lab director despite the fact that he was employed by a separate entity.

"Q. Dr. Siek, what is your profession?

"A. I'm a toxicologist, which covers medical toxicology and forensic toxicology, and I direct a laboratory that does analytical toxicology.

"Q. How long have you been employed with toxicology?

"A. I started that in 1968.

"Q. What lab is it that you work with?

"A. Right now, it's called Analytic Biochemistries.

"Q. Who is it that employs you?

"A. It's Atlantic Diagnostic Laboratories that's the employer." ( N.T. 3/18/2009, p. 52.)

"Q. Have you performed tests on blood samples to determine alcohol concentration?

"A. Yes, I told you that. Since 1968.

"Q. How often would you say you do that?

"A. How often?

"Q. Uh-huh.

"A. Well, I review what somebody's done every day almost, and I do some myself. Not all that many, but I did one this morning, in fact." *Id* at p. 54.

"Q. Dr. Siek, have you reviewed the lab from ABC in this case, the case of Commonwealth versus Brian Dagutis?

"A. Yes.

"Q. How is it that that blood alcohol level is arrived at? What is your process?

"A. Well, the analytical technique is gas chromatography and sampling by headspace. It includes an internal standard. Two different bottles are filled with the test specimen so that you do a duplicate analysis. And then when we go through it, we average the two results and report that. So in this case we got .086 percent and .084 percent. And that becomes, of course, as the mean of .085 percent.

"Q. Are you aware of the term of a variance of blood alcohol levels?

"A. Well, variance with respect to analytical accuracy and precision, yes.

"Q. Can you describe what a variance is?

"A. Well, if you repeat the test many, many times, it's the average difference between answers.

"Q. In your normal blood alcohol testing what is the general variance that you would expect to find?

"A. Okay, the coefficient of variation would be plus or minus three percent of the answer that's reported.

"Q. So, if you're looking at your blood alcohol level of .085, say in this case, if you were to consider the variance that you mentioned, what would be the range of blood alcohol level, given that variance?

"A. .082 to .088.

"Q. So, the variance can go either way?

"A. Yes.

"Q. And in this particular case, you would expect that even given the variance that you are discussing, the lower end of that would be the .082?

"A. Right. That's one standard deviation." *Id.* at pp. 55-57.

The deviations are determined by the methodology utilized by the analyst performing the applicable procedures along with the stringency or rigor of the standards applied to the procedures. While Dr. Siek asserts that the particular analyst who performed the procedures is competent to carry out the procedures appropriately, Dr. Siek was not the person who in fact performed the procedures.

"Q. Dr. Siek, did you perform the actual analysis in this case?

"A. No.

"Q. Someone else did; is that right?

"A. That's correct.

"Q. And the person that performed that was a Dr. Madison; is that right?

"A. Paul Madison, he is not a doctor.

"Q. I am sorry. The initials are P.R.?

"A. Paul R. Madison.

"Q. Do they have the same qualifications as you, do you know?

"A. What was that again?

"Q. Does this Paul R. Madison have the same qualifications as you do?

"A. No. He does not have a Ph.D. degree. He has a chemistry degree. He's been working with us since 1994. He knows the methods very well and has been doing this for a long, long time." *Id.* at pp. 71-72.

Dr. Siek admitted that based on whoever performed the testing, there would be differences in the results that he would expect in the BAC readings. *Id.* at pp.73-83. He contended that the differences he would expect from the lab in question in this case which was his own lab would be 3 percent in 66 percent of the repetitions. In other words, for Siek's lab, if one took the same sample of blood and ran the tests in exactly the same manner, utilizing the same equipment and ran the tests 100 times, 66 of the results would have a variance either up or down in the BAC of 3 percent. Siek would then take the average of those 66 results and take that average as the actual BAC in that sample. *Id.* That, of course, means that 34 of those results would vary by more than 3 percent, which Dr. Siek referred to as "one standard deviation." He then stated that if one applied two standard deviations or 6 percent variance in the test results, 95 percent of the test results would tall within that 6 percent variation. *Id.* Taking the mean of .085 and applying a 6 percent variation, the test result on the low end would come in just under .08. To get to 99 percent of the test results, one would go to three standard deviations which would provide for 9 percent variation and would take the test result in the subject sample mean of .085 to well under .08.

The question of whether the deviations one should apply should be one, two or three deviations would depend on the accuracy of the equipment utilized in the lab; the age and maintenance of the instruments such as the pippettes used to transfer the sample for testing; the

type and amount of substances used to prepare and maintain the blood samples; the skill and experience of the analyst and the protocol used to perform the testing along with other factors. *Id.* at pp. 89-91. Clearly, one with a financial interest in the profitability of the lab would be interested in protecting the solidity of those high standards that would be affected by the typicality and history of the lab's record for standard deviations. Dr. Siek's relationships and his interests were raised by the following inquiry:

"The court: Cross-examine.

"Ms. Adler: Thank you, Your Honor.

"Cross-Examination Of Dr. Theodore J. Siek By Ms. Adler

"Q. Dr. Siek, you used to own Analytical Bio-Chemistry labs; is that right?

"A. I beg your pardon?

"Q. You used to own the lab you work for; is that right? And you recently sold that lab and now you're the director of that lab; is that right?

"A. Yes.

"Q. You[r] lab performs most of the blood alcohol analyses for the Commonwealth?

"A. For Bucks County Police Departments, yes.

"Q. And that's actually your biggest customer; is that right?

"A. I'm not sure. They are a big customer in terms of a single person, or a single entity supplying testing for us." *Id* at p. 69.

Appellee's expert, Dr. Gary Lage, testified that he knew that on prior occasions Dr. Siek admitted that two standard deviations was his lab's standard in determining BAC. *Id.* at p. 92.

## GENERAL IMPAIRMENT DUI —
## RELATION BACK

The relation back or extrapolation concept is one where the capacity of an operator of a motor vehicle is presumed by the level of alcohol in his system at a defined point in time as compared to the time when he or she was operating the motor vehicle. Obviously, the Commonwealth cannot establish the precise amount of alcohol in a defendant's system at the instant he is operating his vehicle and the question is how long after the defendant is stopped by the police can his BAC be reasonably and reliably determined with sufficient exactitude to satisfy the "beyond a reasonable doubt" requirements of the DUI statute. The legislature resolved the issue in large part by setting the standard for the violation as determined by the BAC at any time within a two-hour block of time after operation of the motor vehicle. Left undefined is the extrapolation or relation back issue in the case of general impairment where the state of impairment must be that at or near the instant of operation.

In its analysis of *Segida,* the Superior Court observed "[W]hen a police officer conducts a stop of a vehicle and in due course observes indicia of intoxication which leads to field sobriety tests and a timely BAC test, our law allows the fact-finder to conclude that appellant's state of intoxication after being stopped is indicative of his state while driving. This is so because we recognize that al-

though the state of intoxication is not static, neither is it so dynamic as to change substantially in a short period of time, nor does the state of intoxication fluctuate wildly and unpredictably so as to render a reading one moment irrelevant to the state moments later." *Commonwealth v. Segida,* 912 A.2d 841 (Pa. Super. 2006), *rev'd* on other grounds.

"An expert's description of the nature of alcohol absorption/dissipation was related in *Commonwealth v. Modaffare,* 529 Pa. 101, 601 A.2d 1233 (1992), as follows: a person's blood alcohol level fluctuates with the passage of time, such that the level gradually rises after drinks have been consumed until a peak is reached roughly one hour after drinking has ceased, and that, thereafter, the level declines .... [A]lcohol has no effect until it is absorbed into the bloodstream, which normally takes 30 to 90 minutes." *Id.,* 912 A.2d at 847 n.3.

Those issues were addressed by the parties and certain conclusions were inappropriately drawn which required correction.

"Ms. Adler: Right. But your honor, he doesn't say is that when he actually stopped, was his last drink at 7:30.

"The Court: He would not know when he stopped. All he knows is what the defendant told him.

"Ms. Adler: Exactly. And then the prosecutor is asking Dr. Siek to reach[ed] an opinion based on what Mr. Dagutis may or may have not said. I think the officer said, as best as I can recall, he's not definite. And there's

no specific information as to whether Mr. Dagutis consumed those alcoholic beverages and when he exactly stopped. I don't believe that Dr. Siek has enough information to render an opinion in this matter.

"The Court: Well, if you're saying that the statement that the officer made here in court, that the officer was not accurately reciting what your client told him, then that is something that can be dealt with by your client. But as of this time, there is on the record testimony regarding the time, in a range, as to when and what amount of alcohol and other substances were ingested by the defendant. So the objection is overruled.

"By Ms. Fillman:

"Q. I believe I was asking you, based on the timing that the—the scenario I gave you, that someone was drinking about six or seven beers and maybe some wine at about 7:30 or 8 p.m. at night, and then at 2 in the morning they are located and exhibit these signs. How much [of] a difference are we talking, say if you look at an hour? Say between 2 a.m. and 3 a.m.? Could you estimate how much of a differen[ce] in a blood alcohol level there would be?

"Ms. Adler: Your Honor, I am going to object to this again. This goes back to the relation—back testimony. The legislature specifically rejected this type of testimony when they adopted the new DUI statute. Basically the issue is, was Mr. Dagutis' blood alcohol level over a certain level within two hours of driving—

"The Court: Well, the relation back is the two-hour period.

"Ms. Adler: My understanding is that the legislature has specifically rejected relation-back testimony. The statute says: Was a person's blood alcohol level at a certain point within two hours of driving. So the issue is, was his blood alcohol level at X amount within two hours of driving. Whether or not his blood alcohol level would have been going up or down is not an issue for this court." *Id* at pp. 62-65.

Appellee's attorney was correct in her statement and the undersigned was at least partially incorrect. Relation back per se has been qualified to very recent ingestion as opposed to the six to seven hour interval suggested in this case. Upon further review, and in consideration of the developments in the appellate courts on point in the salient issues in this case, the distinctions pointed out by appellee commands a different result. The fact is that the Commonwealth was seeking to introduce "relation back" as is now clear based on the immediate testimony following the overruling of appellee's objections.

"By Ms. Fillman

"Q. So say for an hour, say between 2 and 3 a.m, and under the scenario that I have given you, could you estimate what kind of difference in blood alcohol level we would be looking at in that time period?

"A. Yes.

"Q. What would you estimate?

"A. You would add .01 to .02 to that particular result, so it would be .095, to .105.

"Q. At a .095 to .105, what signs of impairment are associated with that level?" *Id* at p. 68.

The Superior Court in *Segida,* addressed that issue and the Supreme Court did not disturb that conclusion as follows:

"Of course, technically speaking, all DUI cases involve some degree of extrapolation or relation back as the Commonwealth never truly provides evidence of an individual's incapacity at the moment they were driving, but rather, the Commonwealth necessarily provides evidence of an individual's capacity some time after the vehicle was last driven. When a police officer conducts a stop of a vehicle and then in due course observes indicia of intoxication which leads to field sobriety tests and then a timely BAC test, our law allows the fact-finder to conclude that appellant's state of intoxication after being stopped is indicative of his state while driving. This is so because we recognize that although the state of intoxication is not static, neither is it so dynamic as to change substantially in a short period of time, nor does the state of intoxication fluctuate wildly and unpredictably so as to render a reading one moment irrelevant to the state moments later." *Segida,* 912 A.2d at 846-47

The Supreme Court addressed that matter as a case of first impression in certain respects regarding statutory interpretation, which, as a question of law, required the court to apply a de novo standard of review. *Commonwealth v. Hoke,* 599 Pa. 587, 962 A.2d 664 (2009). The Statutory Construction Act required the court to ascertain and effectuate the intention of the General Assembly. In so doing, the court reviewed the language and patent intent of the legislature.

"The General Assembly enacted section 3802 on September 30, 2003, and it became effective on February 1,

2004, repealing and replacing the prior DUI statute, which had been found at 75 Pa.C.S. §3731 See *Commonwealth v. Duda,* 592 Pa. 164, 923 A.2d 1138 (2007). Under the now-repealed section 3731, it was and is undisputed that the proscribed conduct was driving '*while* under the influence of alcohol to a degree which renders the person incapable of safe driving,' or driving '*while* the amount of alcohol by weight in the blood of the person is 0.10 percent or greater.' 75 Pa.C.S. §3731(a)(1) and (a)(4), respectively, (repealed) (emphasis added). See *Duda, supra* at 1141-44 (setting forth a brief review of the historical background to the repeal of section 3731 and enactment of section 3802). This court has already made clear that, in contrast to the now-repealed subsection 3731(a)(4), which required a specific blood alcohol level *at the time of driving,* subsection 3802(a)(2) deems irrelevant a motorist's blood alcohol level at the time that he or she was driving. *Duda, supra* at 1147. Rather, under subsection 3802(a)(2), the relevant determination is a motorist's blood alcohol level *within two hours after driving. Id.*

"The question presented in the instant case is whether, by analogy to subsection 3802(a)(2), subsection 3802(a)(1) does *not* require the Commonwealth to prove that a motorist had been rendered incapable of safely driving *at the time that he or she actually drove.* In other words, does subsection 3802(a)(1) resemble subsection 3802(a)(2) in that the actual time of driving is not included in the elements of the offense? Or, alternatively, does subsection 3802(a)(1) resemble the repealed subsection 3731(a)(1) in that an element of the offense is driving *while* incapable of doing so safely? More succinctly, the issue can be stated as follows: is subsection 3802(a)(1)

an 'at the time of driving' offense?" *Segida,* 985 A.2d at 875-76

The Supreme Court answered that question in the affirmative and that answer along with the paucity of reliable field observations directed us to the inescapable conclusion that we should grant instant appellee's motion.

## CONCLUSION

We appropriately granted appellee's post-trial motions reversing our finding of guilt and entered a verdict of not guilty.