## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-237


**STATE OF LOUISIANA**

**VERSUS**

**KEVIN D. BOLDEN**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 08K3059C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## OSWALD A. DECUIR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and Jimmie C. Peters, Judges.


**CONVICTIONS AND SENTENCES
REVERSED AND REMANDED.**


**Earl B. Taylor**
**District Attorney**
**Twenty-Seventh Judicial District**
**P. O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**Counsel for Appellee:**
        **State of Louisiana**


**Jennifer Ardoin**
**Assistant District Attorney**
**Twenty-Seventh Judicial District**
**P. O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**Counsel for Appellee:**
        **State of Louisiana**

**Mark O. Foster**
**Louisiana Appellate Project**
**P. O. Box 2057**
**Natchitoches, LA 71457**
**(318) 572-5693**
**Counsel for Defendant/Appellant:**
    **Kevin D. Bolden**

**DECUIR, Judge.**

Defendant, Kevin D. Bolden, was convicted of two counts of aggravated rape and was sentenced to two terms of life imprisonment without benefit of parole, probation, or suspension of sentence. The sentences are to run concurrently. Defendant alleges the trial court erred by denying his motion *in limine* and in allowing the State to use the results of certain DNA tests at trial without testimony from the individuals who generated the profiles. He contends the error was not harmless because the evidence would have been insufficient to convict him without these test results.

## FACTS

Two aggravated rapes were committed in St. Landry Parish in 1998 and 1999. Evidence from the crime scenes was collected and submitted to the Acadiana Criminalistics Laboratory (ACL). Neither victim could identify her attacker. Evidence from the 1998 rape was submitted to ACL on November 30, 1998. ACL did not do DNA testing at that time, and "the case was kind of set aside."

When a serial killer appeared in Southwest Louisiana, ACL and the State Police Lab received a grant from the Louisiana legislature to investigate unsolved sexual assault cases in an effort to find a living victim of the murderer. ACL was "swamped with working suspect samples" in connection with that investigation, so it chose Orchid Cell Mark (OCM) in Nashville, Tennessee, and two other labs to help ACL evaluate samples.

Carolyn Booker and Winnie Kurowski, ACL forensic scientists, went through ACL's old cases in 2003. On August 25, 2003, evidence concerning the 1998 rape was submitted to OCM for DNA testing. OCM generated a DNA

profile based on that evidence but did not identify the contributor of the evidence samples. ACL staff had no idea, and no way to know, of any connection between the 1998 and 1999 rapes. When a national DNA database, the Combined DNA Index System (CODIS), was implemented, ACL gained the ability to check DNA profiles against others, both within and outside the lab.

OCM was a private laboratory whose test results were owned by ACL. OCM's tests were performed according to a contract that dictated how the tests were to be done. ACL set out how OCM should go about generating the DNA profile, what kind of instruments OCM should use, how ACL wanted the report generated, and how ACL wanted the charts formed.

The FBI set the protocol for all DNA labs. Accredited labs followed an accredited procedure using universal software, and they all followed the same standards, insuring their quality of work. CODIS was able to exist because different labs which ran the same information would produce the same answer. CODIS is controlled by the FBI, and information must meet FBI standards before it is entered into the system. All data must be reviewed before it is entered into CODIS.

Ms. Kurowski explained the analyst's role at the hearing of the motion. The analyst chooses the sample and extracts the DNA from it. He then identifies how much DNA is present in the sample, and he carries it forward into the separation stage. The DNA is then put into an instrument and channeled through a software program. The analyst then interprets the data produced by the software. The procedure for placing the sample into the machine is "pretty much universal throughout . . . different labs." Analysts must meet a certain level of qualification before they can conduct DNA analysis using the universal software.

2

At trial, Ms. Kurowski explained the process that analyzed DNA markers. Samples were amplified and placed into the instrument that separated the DNA fragments. Software assigned a marker called an allele, and generated a printout of electropherograms. An analyst then examined the printout to evaluate the profile and verify the validity of the alleles. OCM and ACL used software that analyzed the information the same way and produced the same outcome.

Arthur Young, an analyst and former ACL employee, examined the evidence from the 1999 case and generated a DNA profile. He did not identify the donor of the male DNA fractions in the samples. Mr. Young trained Ms. Kurowski at ACL. While the reports of Mr. Young and OCM were admitted into evidence at the hearing of the motion, only one page of Mr. Young's report was admitted at trial; this was the printout of electropherograms. Mr. Young did not testify at trial. Ms. Kurowski was not present at OCM when the 1998 evidence profile was generated there or at ACL when Mr. Young generated the profile in the 1999 case.

One of Carolyn Booker's job responsibilities at ACL was administration of the CODIS database, overseeing the entry of DNA profiles into the database. She made certain the FBI standards and guidelines were followed. The database contained DNA profiles of known and unknown references that were compared to each other. Ms. Booker searched the local databases to see if there were any case to case matches. She uploaded the local information to the state system, and a statewide search was done. The State uploaded all the profiles entered by labs throughout the state, and a national search was performed.

Regarding the 1998 and 1999 rapes, Ms. Booker reviewed the profiles generated by OCM and by Mr. Young at ACL before Ms. Kurowski entered them into the CODIS database. She interpreted the product of their work herself and independently evaluated the profiles. George Schiro, the technical leader at ACL,

3

also reviewed the OCM and Young profiles. Ms. Kurowski reviewed the data generated by OCM and by Mr. Young. When the profiles, reviewed three times, were entered into CODIS, the system indicated a match, and the donor of the DNA was identified.

This identification, however, was not what was relied on at trial. On June 12, 2008, Lieutenant Donald Thompson of the Opelousas City Police Department, obtained a swab from the interior of Defendant's mouth for the purpose of DNA testing, and he arranged for the swab's transfer to ACL. Ms. Kurowski generated a profile from that sample and compared it to the DNA profiles generated by others from the 1998 and 1999 cases. Her conclusion was that to a reasonable degree of scientific certainty, the same person gave the reference sample, left semen on the victim's bed sheet in the 1998 case, and left semen in the victim's vagina in the 1999 case. That conclusion was based on the technical work performed by OCM and Mr. Young because she had to look at their reports. Ms. Kurowski's work was peer-reviewed by Ms. Booker and Mr. Schiro and, thus, was not just her own opinion, but the opinion of ACL. Review of the record shows evidence of the DNA matches was the only evidence linking Defendant to the rapes.

Defendant made an oral motion *in limine* immediately prior to the opening statements at trial. He alleged it "ha[d] come to defense's attention" that the State did not plan to call the OCM analyst and Mr. Young as witnesses and, therefore, they would not be available for cross-examination. Because of the alleged violation of his right to confront and cross-examine witnesses, Defendant asked the trial court to prohibit the introduction of the results of the tests those analysts conducted. The trial court denied the motion because the State showed the data met all the ACL standards and were independently reviewed. The trial court

4

believed the issue was one of the weight of the evidence rather than its admissibility.

## ASSIGNMENT OF ERROR

*Confrontation Clause*

Defendant argues the trial court erred in denying his motion *in limine* and in allowing the State to use the results of the DNA tests at trial without producing the individuals who conducted the tests for confrontation and cross-examination. He claims this ruling denied his federal and state constitutional rights, specifically the Confrontation Clause. He also contends the evidence at trial would have been insufficient to convict him had the motion been correctly granted because no other evidence linked him to either crime.

The Sixth Amendment to the U.S. Constitution provides the defendant "[i]n all criminal prosecutions . . . shall enjoy the right . . . to be confronted with the witnesses against him." The Supreme Court has identified a "core class of 'testimonial' statements" which equate to a witness who bears testimony against an accused. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354, 1364 (2004). Those statements include:

> *"[E]x parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," . . . "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," . . . [and] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* (quoting in part *White v. Illinois*, 502 U.S. 346, 365, 112 S.Ct. 736, 116 (1992).

The court noted testimonial statements are admissible when the witness is absent from trial "only where the declarant is unavailable, and only where the defendant

has had a prior opportunity to cross-examine." (footnote omitted). *Id.* at 1369. Thus, the Confrontation Clause requires "not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 1370.

In *Melendez-Diaz v. Massachusetts*, 557 U.S.__, 129 S.Ct. 2527, 2530 (2009), the Court found certificates of forensic analysis were "testimonial statements" as envisioned by *Crawford*, making them "subject to the defendant's right of confrontation under the Sixth Amendment." The prosecution submitted three certificates of analysis which identified the substance seized from the defendant's accomplice as cocaine. The Court could "safely assume" the analysts who signed the certificates were aware of their evidentiary purpose, which was printed on the certificates themselves. *Id.* at 2532. Further, the analysts provided testimony against the defendant by identifying the substance as cocaine. Although the Court acknowledged other and perhaps better ways to challenge forensic test results, it noted "the Constitution guarantees one way: confrontation." *Id.* at 2536. The Court held the lower courts denied the defendant's right to confrontation and cross-examination and reversed their rulings.

Defendant here cites *Crawford* and *Melendez-Diaz* in support of his argument that he had the constitutional right to confront and cross-examine the OCM analyst and Arthur Young. He contends the procedure for generating the profiles they compiled was sufficiently subject to error or manipulation to invoke his Confrontation Clause rights.

Since Defendant's brief was submitted, the Supreme Court decided *Bullcoming v. New Mexico*, 564 U.S. __, 131 S.Ct. 2705 (2011). In *Bullcoming*, prosecutors submitted evidence of the defendant's intoxication via a forensic laboratory report showing a blood alcohol level of 0.21. The lab analyst, Mr.

Caylor, did not testify, and evidence showed he "was placed on unpaid leave for an undisclosed reason." *Id.* at 2714. Another analyst, Mr. Razatos, testified about Mr. Caylor's test results. The State never showed "[Mr.] Razatos had any 'independent opinion' concerning [the defendant]'s BAC." *Id.* at 2716. The Court stated "the [Confrontation] Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Id.* Thus, when the State introduced Mr. Caylor's certification of his test results, he "became a witness [the defendant] had the right to confront." *Id.* Nevertheless, the Court noted the State "could have avoided any Confrontation Clause problem by asking [Mr.] Razatos to retest the sample, and then testify to the results of his retest rather than to the results of a test he did not conduct or observe." *Id.* at 2718.

While we agree with the dissent in *Bullcoming* that the majority opinion extends the prior rulings of the court, both opinions make it clear that the court's ruling is controlling in the present case. Ms. Kurowski had no part in the analysis of the vaginal swab from the 1999 case in which Mr. Young generated the DNA profile. No one who was involved in the processing or the original analysis testified at trial. Likewise, neither Ms. Kurowski nor anyone at ACL was involved in the generation of the DNA profile in the 1998 case. They were not involved in the processing of the bed sheet from which the DNA evidence came, although Ms. Kurowski did help prepare the sample for transmission. Someone at OCM, who did not testify at trial, generated a DNA profile through work on which Ms. Kurowski relied. While ACL dictated what the OCM analyst and Mr. Young were supposed to do, no one testified they actually did it, and their actions were not subjected to cross-examination. Ms. Kurowski compared the DNA profile from the reference swab to DNA profiles she did not generate. She did not examine the

semen from the bed sheet in the 1998 case or the semen from the victim's vagina in the 1999 case, but she testified the DNA from both samples matched the DNA reference sample from Defendant. When asked whether she "passed on the validity of someone else's work," Ms. Kurowski responded, "Uh, yea. I guess that would be a correct statement." Accordingly, we find that applying the standard established in *Bullcoming*, Defendant's Confrontation Clause rights were violated. The trial court erred in denying Defendant's motion *in limine*.

<u>*Remedy for violation of Confrontation Clause*</u>

Having found that Defendant's Confrontation Clause rights were violated, the next step is to determine whether the error was harmless. *State v. Robinson*, 01-273 (La. 5/17/02), 817 So.2d 1131. The *Robinson* court quoted *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438 (1986), on this issue:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Robinson*, 817 So.2d at 1137.

When the error is harmless, and the evidence is sufficient to support the conviction, the conviction is properly affirmed. *State v. Wright*, 96-786 (La.App. 3 Cir. 2/19/97), 690 So.2d 850, *writ denied*, 97-665 (La. 9/26/97), 701 So.2d 978. However, if the error is harmful, the court "must reverse the defendant's conviction." *Id.* at 855. Nevertheless, "the Supreme Court has held that even with a finding of harmful error, if the overall evidence, including the victim's testimony,

8

is sufficient to support the conviction, the state is entitled to retry the defendant. *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); *[State v.] Murphy*, 542 So.2d 1373 [(La.1989)]." *Id.*

Here, if the trial court had granted the motion *in limine*, Ms. Kurowski, Ms. Booker, and Mr. Schiro would not have been able to testify about the DNA profiles generated by OCM and Mr. Young. Rather, they could have testified only to the profile Ms. Kurowski generated from Defendant's reference sample. Without testimony pertaining to the CODIS match, which relied on the OCM and Young profiles, the jury would have had no evidence to link Defendant to these two rapes. In this case, the error is clearly not harmless. Without the prohibited testimony, the evidence was insufficient to convict Defendant. Thus, Defendant's convictions must be overturned, and he may not be retried.

### *Applicability of La.R.S. 15:499 et seq.*

Defendant correctly points out this is not an issue of the applicability of La.R.S. 15:499 *et seq.* That group of statutes provides that a crime lab's certificate of analysis is *prima facie* proof of its contents when proper notice is given to the party against whom the evidence is used. La.R.S. 15:500. The State did not offer such a certificate here, however, making the statutes inapplicable.

### DECREE

Defendant's constitutional right to confront and cross-examine witnesses was violated and, therefore, the trial court erred in denying his motion *in limine*. *Bullcoming v. New Mexico*, 564 U.S. __, 131 S.Ct. 2705 (2011). Accordingly, Defendant's convictions and sentences are reversed, and this case is remanded for further proceedings consistent with this decision. *State v. Wright*, 96-786 (La.App. 3 Cir. 2/19/97), 690 So.2d 850, *writ denied*, 97-665 (La. 9/26/97), 701 So.2d 978.

**CONVICTIONS AND SENTENCES REVERSED AND REMANDED.**

9