*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 23, 2020

Plaintiff-Appellee,

v

No. 348592
Wayne Circuit Court
LC No. 18-009678-01-FC

MICHAEL DELON FLEMING,

Defendant-Appellant.

Before: MARKEY, P.J., and M. J. KELLY and BOONSTRA, JJ.

PER CURIAM.

Defendant was convicted by a jury of first-degree criminal sexual conduct (CSC I), MCL 750.520b. He was sentenced to 18 to 40 years' imprisonment. Defendant appeals by right. We affirm.

## I. FACTS

On May 9, 2001, the victim, CM, went to a hair salon to have her hair braided for her upcoming high school prom. Afterward, CM boarded a bus and headed home. When she exited the bus about two blocks from her house, it was dark. A man in a black Jeep Cherokee SUV, later identified as defendant through DNA testing, approached CM and asked her for directions. After she gave defendant directions, he drove away; however, he soon returned in his vehicle. He then stepped out of his SUV, advanced toward CM, and said something about someone nearby having killed a member of his family. Defendant next hit CM on the forehead with a gun and told her to get in the SUV. He also threatened to kill CM, and she entered his vehicle as demanded. He struck her in the head again, drove off, and parked behind an apartment building. Defendant warned CM not to scream or he would kill her. He began hitting her again with the gun and told her to get in the backseat of the SUV. Defendant then ordered CM to take off her clothes. She complied because she was afraid that defendant was going to kill her. Defendant removed his pants, climbed into the backseat, got on top of CM, and engaged in penile-vaginal penetration. When he stopped, defendant threw CM's clothes at her, told her to get dressed, and began striking her again with his gun. Defendant then physically shoved CM out of the vehicle. Defendant warned CM not to tell anyone or else he would find her and kill her. Defendant proceeded to drive away.

-1-

CM crawled to a nearby house for help. She was able to call her mother and the police. CM was found bleeding from her head and appeared to be in a daze. CM's mother accompanied her to the hospital. Dr. Harold Derstine and the staff at Sinai Grace Hospital performed a sexual assault examination of CM. Dr. Derstine took swabs of CM's vagina for potential DNA evidence, and he then placed the swabs in a sealed rape kit. Dr. Derstine also treated a deep laceration on CM's forehead, which required stitches. CM was prescribed various medications and was discharged.

The rape kit was sent to the Detroit Police Department (DPD), which received it on August 20, 2001. Thereafter, the kit was placed in private storage where, unfortunately, it sat from 2001 until December 2013. Once the rape kit was discovered, it was sent to a private laboratory, Sorenson Forensics, for testing. Derek Cutler was employed as a forensic DNA analyst at Sorenson Forensics. He was admitted as an expert witness in the field of forensic DNA analysis. Cutler's involvement in this case was primarily "on the back end," meaning that he did not perform the actual analysis but rather was responsible for "interpretation of [the] result, forming conclusions, and report writing." He testified that the swabs taken from CM revealed the presence of male DNA. The laboratory test indicated that the male DNA included sperm cells. Cutler was able to interpret the data and develop a unique DNA profile for the then-unknown male DNA. But he did not have any DNA comparison sample at the time. Sorenson Forensics then sent the rape kit and the analysis report to the DPD. The report was also sent to the Michigan State Police, where Amber Young, a forensic scientist, entered the DNA profile from Sorenson Forensics into the Combined DNA Index System (CODIS). Joshua Strong, a CODIS scientist for the Michigan State Police, testified that the DNA profile matched the DNA profile belonging to defendant, whose DNA profile was already in CODIS. Strong issued a report and sent it to the DPD, informing the department of the match and the need to obtain a sample from defendant to compare and confirm the match.

Detective Jamie Pouliot, a cold case detective assigned to a sexual assault task force within the Wayne County Sheriff's Department, worked on the case in 2018. He obtained a search warrant for a buccal swab from defendant to be used to compare and confirm the DNA match from CODIS. Detective Pouliot also met twice with CM, including once as part of a Sexual Assault Forensic Examiner's (SAFE) interview. At the SAFE interview, Detective Pouliot showed CM a photographic lineup and asked her if she recognized any of the individuals. Defendant's photograph was included in the lineup. CM, however, did not recognize him as her assailant. Detective Pouliot also searched for relevant vehicles registered in defendant's name, but he found none registered to defendant or his immediate family. Detective Pouliot was able to obtain an address with respect to defendant's residence in 2001. And he discovered that a "metallic silver" 2000 Jeep had been registered to a person at that address at the time of the sexual assault. On cross-examination, and much to the surprise and chagrin of defense counsel, Detective Pouliot, while confirming that the Jeep had not been registered in defendant's name, explained that it had been registered in the name of one of defendant's cousins with whom defendant was living in 2001.

Jessica Drager, a forensic scientist with the Michigan State Police crime laboratory, was admitted as an expert witness in the field of forensic science. She had worked on CM's case. Drager compared the DNA profile developed by Sorenson Forensics to the reference sample recently acquired from defendant pursuant to the search warrant. She testified that defendant's

DNA reference sample matched the DNA profile developed by Sorenson Forensics. Drager stated that the odds of the DNA from defendant's reference sample matching the DNA profile developed by Sorenson Forensics and being from someone other than defendant were between "one in one hundred and forty-two point nine quintillion" and "one in seven hundred and forty-eight point five quintillion," adjusting for different races. Drager testified that the best estimate at the time was that there were only about seven billion people on Earth. She would expect, therefore, that only one person on Earth had that specific DNA profile—defendant.

Defendant chose not to testify. The jury then found him guilty of one count of CSC I. Defendant was sentenced to a long term in prison, 18 to 40 years. This appeal ensued.

## II. ANALYSIS

## A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was insufficient to support a conviction for CSC I. More specifically, defendant contends: (1) that CM was unable to identify defendant as her assailant; (2) that introduction of the DNA analysis or lab report violated the Confrontation Clause under *Melendez-Dias v Massachusetts*, 557 US 305; 129 S Ct 2527; 174 L Ed 2d 314 (2009), because it was testimonial in nature and because Cutler did not do the actual DNA analysis; and (3) that "there was less than compelling evidence that the DNA found in the vagina of the complainant . . . was in fact from [defendant's] semen[,] which proposition is the only basis to conclude that his penis was in her vagina."

In *People v Kenny*, __ Mich App __, __; __ NW2d __ (2020); slip op at 5, this Court observed:

> This Court reviews de novo the issue regarding whether there was sufficient evidence to support a conviction. In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts in the evidence must be resolved in favor of the prosecution. [Quotation marks and citations omitted.]

Defendant's argument is, essentially, that there was a lack of sufficient evidence establishing defendant's identity as the perpetrator and showing that an act of sexual penetration had occurred. "[I]t is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). And CSC I does require proof of sexual penetration, MCL 750.520b(1), which is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse,

or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required," MCL 750.520a(r).

Although she could not identify defendant as the rapist, CM's testimony provided sufficient evidence showing that penile-vaginal penetration had indeed occurred, and the DNA evidence was more than sufficient to establish that not only was there penetration, but that it was defendant who sexually penetrated CM. With respect to the DNA analysis or lab report, it was admitted into evidence during the testimony of Derek Cutler, who, as noted earlier, was a forensic DNA analyst at Sorenson Forensics. Cutler *authored and issued* the DNA lab report, and he was vigorously cross-examined. Accepting that the DNA lab report was testimonial in nature for purposes of the Confrontation Clause, we find there was no constitutional infringement: Cutler testified at trial and was cross-examined in regard to the report. *Melendez-Dias* involved the admission of certificates of analysis sworn to by state laboratory analysts *who did not testify at trial*. *Melendez-Dias*, 557 US at 308. The *Melendez-Dias* Court held:

> In short, under our decision in *Crawford*[1] the analysts' affidavits were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to be confronted with the analysts at trial. [*Id.* at 311 (quotation marks and citation omitted).]

*Melendez-Dias* is thus easily distinguishable and has no bearing on the instant case.

Although someone besides Cutler physically analyzed the DNA evidence, it was ultimately Cutler who interpreted the analysis and results, formed the scientific conclusions, and drafted the report. Consequently, it was proper to admit the DNA lab report into evidence through Cutler's foundational testimony, and defendant's confrontation rights were fully protected because Cutler was available for cross-examination regarding his lab report.

We also note that defense counsel expressly indicated that there was no objection to the admission of the DNA lab report; therefore, any claim of error was waived. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

With respect to defendant's argument that there was less than compelling evidence that the DNA swabbed from CM's vagina was from semen, Cutler testified that the test designed to detect semen was inconclusive, which he suggested was due to degradation of the sample over time. But he also opined that even though specific sperm cells could not be visualized, detectable biological differences identified in the DNA profile indicated "that sperm cells were very likely present." Cutler additionally testified that the chance that the DNA came from a source other than semen was "very unlikely." Moreover, the jury could consider Cutler's testimony in conjunction with CM's testimony about sexual penetration, thereby lending even stronger support that the DNA came from semen and established penile-vaginal penetration. We also note that if by chance the

---

[1] *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

DNA was not from defendant's semen, the evidence still established that defendant's DNA was, in fact, found in CM's vagina, indicating defendant vaginally penetrated CM so as to leave DNA. See MCL 750.520a(r). In sum, we hold that the evidence was sufficient to support the conviction for CSC I.

## B. PROSECUTOR MISCONDUCT – DISCOVERY VIOLATION

Defendant next argues that the prosecutor committed misconduct by failing to provide complete discovery to the defense that resulted in trial counsel's unwittingly eliciting testimony on cross-examination of Detective Pouliot that defendant's cousin, with whom defendant was residing in 2001, owned a metallic silver 2000 Jeep at the time of the offense. Defendant acknowledges that this alleged discovery failure did not constitute a violation under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), as the evidence was not exculpatory in nature. "Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case[.]" *Id.* at 64.

It appears from the record that Detective Pouliot had prepared a report with notes that he occasionally updated with new information and that the most recent version of the report included the information that defendant's cousin owned the Jeep. The prosecutor sent defense counsel an earlier version of the report that did not contain this information.[2] And in fact it looks as if the prosecutor herself did not have the updated report at trial, which would explain why she did not elicit the information of this relevant evidence on direct examination of Detective Pouliot.

MCR 6.201(J) provides:

> If a party fails to comply with this rule [regarding discovery], the court, in its discretion, may order the party to provide the discovery or permit the inspection of materials not previously disclosed, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances. Parties are encouraged to bring questions of noncompliance before the court at the earliest opportunity. Willful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court. An order of the court under this section is reviewable only for abuse of discretion.

We have no indication whatsoever of any willful discovery violation by the prosecutor. Defense counsel did not move for a continuance or a mistrial, nor did he ask for a curative instruction, which probably would have drawn more attention to the matter—the horse was out of the barn.

We cannot conclude that defendant was prejudiced by the discovery violation; therefore, reversal is unwarranted. MCL 769.26; *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

---

[2] "If at any time a party discovers additional information or material subject to disclosure under this rule, the party, without further request, must promptly notify the other party." MCR 6.201(H).

Detective Pouliot conceded in front of the jury that there was no determination that the cousin's Jeep was used in the crime. Moreover, in light of CM's untainted testimony and the virtually insurmountable and untainted DNA evidence, the jury plainly would have convicted defendant of CSC I regardless of the discovery violation. Finally, the testimony defense counsel elicited during cross-examination of Detective Pouliot would have been admissible against defendant had the prosecutor sought to introduce the evidence. In sum, we hold that reversal is unwarranted in regard to defendant's argument of prosecutorial misconduct.

## C. 17-YEAR DELAY IN CHARGING DEFENDANT

Defendant next maintains that the trial court erred by denying his motion to dismiss the CSC I charge due to the unacceptably-long, 17-year delay in bringing the charge. Defendant points out that he was imprisoned from 2002 to 2014, that the CSC I offense was committed in 2001, and that he was not arrested for the crime until 2018, years after he was released from prison. Defendant argues the 180-day rule was violated, and consequently he was deprived of the opportunity to have all of his prison sentences run concurrently consistent with the legal principle disfavoring accumulated sentences. Defendant asserts that the refusal to dismiss the charge denied him due process of law. In a Standard 4 brief, defendant adds that the substantial delay in charging him prejudiced his defense. He contends that had charges been pursued in 2001, he may have had an available alibi witness and, in the alternative, a defense of consensual relations could also have been argued. Defendant claims that he was shot in the head a few weeks after the alleged sexual assault in 2001, that he spent a week in a coma, that he now suffers from diminished mental capacity, and that he lost all memory and recollection of the claimed assault. In an attached affidavit, defendant avers that he and CM "may have had a consensual sexual relationship and that any witness to this fact were dead."

Although we review for an abuse of discretion a trial court's ruling on a motion to dismiss, *People v Adams*, 232 Mich App 128, 132; 591 NW2d 44 (1998), this Court reviews de novo the issue whether a delay in charging a defendant violated his or her due process rights, *People v Reid (On Remand)*, 292 Mich App 508, 511; 810 NW2d 391 (2011).

We find defendant's argument under the 180-day rule entirely lacking in merit: The 180-day rule has no application under the circumstances presented here. When defendant was in prison from 2002 to 2014, there was no pending untried warrant, indictment, information, or complaint setting forth the charge of CSC I arising out of the sexual assault against CM in 2001. MCL 780.131(1) (180-day rule); MCR 6.004(D)(1) (180-day rule). Defendant was not even identified as a suspect until after he was released from prison.[3]

---

[3] We also disagree with defendant's associated argument that he was prejudiced by not being able to have the benefit of concurrent sentencing because of the delay, an argument this Court has previously rejected. *People v Scott*, 324 Mich App 459, 465; 924 NW2d 252 (2018) ("defendant's attempt to show prejudice by demonstrating unfavorable sentencing ramifications is misplaced in the context of the due-process analysis").

"Before dismissal may be granted because of prearrest delay there must be actual and substantial prejudice to the defendant's right to a fair trial *and an intent by the prosecution to gain a tactical advantage.*" *People v Patton*, 285 Mich App 229, 237; 775 NW2d 610 (2009) (quotation marks and citation omitted; emphasis added). Mere delay between the time that an offense is committed and the time of arrest does not constitute a denial of due process because there is no constitutional right to be arrested. *Id.* at 236. Here, we are not confronted with a situation in which the authorities had identified defendant as a potential suspect and then intentionally delayed pursuing charges against him to gain the upper hand. Rather, this case presented a situation involving a lack of due diligence by authorities in the investigation of a crime—it was an investigatory failure. There was no grand scheme pursuant to which the prosecution intended to gain a tactical advantage, and defendant had no constitutional right to be arrested. See *id.* at 237 ("Defendant has presented no evidence that the delay by the prosecution in learning his whereabouts was an attempt to gain a tactical advantage."). Accordingly, we reject defendant's due process argument. Moreover, we cannot conclude that defendant has demonstrated "actual" prejudice on the existing record, as he speaks vaguely and in terms of mere possibilities.[4]

## D. SENTENCING ISSUES

Finally, defendant challenges the scoring of multiple offense variables (OVs), along with claiming that trial counsel was ineffective for failing to seek a downward departure because of defendant's diminished mental capacity. Under the sentencing guidelines, the trial court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013); *People v Rhodes (On Remand)*, 305 Mich App 85, 88; 849 NW2d 417 (2014). Clear error is present when the appellate court is left with a firm and definite conviction that an error occurred. *People v Fawaz*, 299 Mich App 55, 60; 829 NW2d 259 (2012). This Court reviews de novo "[w]hether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute . . . ." *Hardy*, 494 Mich at 438; see also *Rhodes*, 305 Mich App at 88. In scoring OVs, a court may consider all record evidence, including the contents of a presentence investigation report, plea admissions, and testimony presented at a preliminary examination. *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170 (2012).

Defendant challenges the assessment of 10 points for OV 4, 50 points for OV 7, and 15 points for OV 10. Ten points must be assessed for OV 4 when "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). MCL 777.34(2) provides some clarification, directing a court to "[s]core 10 points if the serious psychological injury may require professional treatment." And "the fact that treatment has not been sought is

---

[4] While defendant claims memory loss from being shot in the head about three weeks after the sexual assault, the state could not have obtained a DNA sample, identified him, and arrested him before he was shot, assuming all of that was even possible. Hence, defendant would have had the same "recollection" problem regardless of the delay. We also note that defendant indicates that he informed the presentence investigator that he had met CM in high school and that they had engaged in sex for money in the past. While we appreciate that defendant had a constitutional right not to testify, for purposes of assessing prejudice, he certainly could have taken the stand and made these claims to the jury.

not conclusive." *Id.* Defendant waived this argument when counsel agreed with the prosecutor that a 10-point score was appropriate. *Carter*, 462 Mich at 215. But defendant bootstraps a claim of ineffective assistance of counsel based on the waiver.

We conclude that the trial court did not err in assessing 10 points for OV 4. CM testified that after the assault she felt "[v]iolated" and "angry." CM's mother testified that when her daughter returned home from the hospital, she was "hysterical" and that thereafter "[h]er mind was messed up" and her "thoughts" were "just horrible." CM's mother observed that the day after the rape, CM was "still in the state of panic," which was different from CM's usual "happy" demeanor. We conclude that this evidence sufficed to support the assessment of 10 points for OV 4. See *People v Williams*, 298 Mich App 121, 124; 825 NW2d 671 (2012) ("The victim's statements about feeling angry, hurt, violated, and frightened support [the 10-point] score under our case law."). Defense counsel is not ineffective for failing to raise futile objections. *People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000). Moreover, even if the 10-point assessment for OV 4 constituted error, the issue was close enough such that we cannot conclude that counsel's waiver fell below an objective standard of reasonableness. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).[5]

With respect to OV 7, we note that an assessment of 50 points is proper if the victim was treated with "excessive brutality." MCL 777.37(1)(a). Considering that defendant repeatedly beat CM in the head with a gun, requiring stitches, repeatedly threatened to kill her, and then pushed her out of the SUV into the night after raping her, we agree that the 50-point score was entirely appropriate.

With respect to OV 10, a 15-point assessment is proper if the defendant engaged in "predatory conduct," MCL 777.40(1)(a), which is defined as "preoffense conduct directed at a victim . . . for the primary purpose of victimization," MCL 777.40(3)(a). Predatory conduct encompasses conduct such as lying in wait and stalking, as opposed to purely opportunistic criminal conduct. *People v Huston*, 489 Mich 451, 462; 802 NW2d 261 (2011). CM testified that defendant initially drove up to her and asked for directions. He then drove away but soon turned around and drove back toward CM. Defendant proceeded to exit the SUV and approached CM with a gun, eventually forcing her into his vehicle. We conclude that this conduct was akin to stalking or lying in wait; therefore, the trial court did not err in assessing 15 points for OV 10. Moreover, even if OV 10 should have been assessed zero points, his total OV score would be reduced from 130 points to 115 points, keeping defendant at OV level VI (100+ points) on the Class A grid. MCL 777.62.[6] And when a scoring error does not alter the appropriate guidelines range, a defendant is simply not entitled to resentencing. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

---

[5] We note that we have not been provided the presentence investigation report, which perhaps sheds more light on any psychological harm suffered by CM from the brutal rape.

[6] We note that the same is true if there was an error in assessing 10 points for OV 4.

Finally, defendant argues that counsel provided ineffective assistance by failing to argue for a downward departure from the guidelines range based on defendant's diminished mental capacity. The trial court, however, noted:

> I am aware of the documented mental health history, that you have had to deal with.

> But the fact remains, you perpetrated a very violent crime on a nineteen year old child. Young lady. A high school student.

> And when I consider all these circumstances, I'm left to the inevitable conclusion that your conduct must be dealt with, proportionately.

Because the trial court was well aware of defendant's alleged mental health issues yet punished him toward the middle of the minimum sentence guidelines range, defendant has not demonstrated the requisite prejudice, assuming deficient performance by counsel. *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001). Clearly, given the trial court's comments, a request by counsel for a downward departure would not have made any difference in defendant's minimum sentence.

We affirm.

/s/ Jane E. Markey
/s/ Michael J. Kelly
/s/ Mark T. Boonstra